RECEIVED

OCT - 2 2006

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

UNITED STATES DISTRICT COUR FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| C&O MOTORS, INC., a West Virginia corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. 2:2005-CV-00835 |
| | ) | |
| GENERAL MOTORS CORPORATION, a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF GENERAL MOTORS CORPORATION'S
RULE 56 MOTION FOR SUMMARY JUDGMENT**

**THE TINNEY LAW FIRM, PLLC**

John H. Tinney  (WV State Bar #3766)
John H. Tinney, Jr. (WV State Bar #6970)
Chase Tower, 14th Floor
707 Virginia Street, East
Charleston, WV  25337-3572
Telephone: (304) 720-3310

**KIRKLAND & ELLIS LLP**
Mark S. Lillie
Joseph Russell
200 East Randolph Drive
Chicago, IL  60601
Telephone:  (312) 861-2000

*ATTORNEYS FOR DEFENDANT
GENERAL MOTORS CORPORATION*

October 2, 2006

## INTRODUCTION

This is a commercial dispute brought by a large car dealer from Saint Albans, West Virginia.  The plaintiff, C&O Motors, Inc., sells and services GM's Chevrolet line of vehicles and it previously sold GM's Oldsmobile line as well.  The C&O dealership spans over a number of parcels of land on both sides of Route 60.  Under C&O's Dealer Sales and Service Agreement with GM, certain parcels are used and only approved for GM dealership operations. C&O also sells and services various non-GM vehicles — including the Toyota, Lexus, Scion and Nissan lines — on the other parcels of land.  This case focuses on the relatively small Oldsmobile segment of C&O's business and, more particularly, relates to a claim for damages arising out of GM's decision in 2000 to phase-out the Oldsmobile brand.

C&O claims, in essence, that by phasing out the Oldsmobile brand, GM failed to honor its contractual and statutory obligations to C&O.  After depositions of its key employees and principal, and after completing other discovery, plaintiff's Complaint can now be distilled down to two essential claims.  First, in phasing out the Oldsmobile brand, plaintiff claims that GM failed to deliver Oldsmobile vehicles to C&O from about August 20, 2004, through the expiration of the Dealer Agreement in October 2005.  Second, after the phase-out announcement, when the plaintiff acquired and then moved what it claims to be a "replacement" Nissan dealership into the GM-dedicated facilities, plaintiff claims that GM violated the parties' contract and West Virginia statutes by "threatening" to terminate the plaintiff's Chevrolet Dealer Agreement and by insisting on separate dealership facilities.  As damages for this alleged wrongful conduct, C&O seeks to recover the money it spent to buy the "replacement" Nissan dealership and construct the dealership facilities from which it now operates a very profitable business.

C&O's Complaint cannot survive summary judgment.  As to GM's failure to deliver Oldsmobiles over the last fourteen months of the parties' contract, plaintiff's allegations in the Complaint are now flatly contradicted by the uncontroverted record facts.  Indeed, the record evidence demonstrates that C&O was able to order — and receive — new Oldsmobile vehicles well beyond the August 2004 timeframe and simply declined (or failed) to do so.  Nor can C&O maintain a claim (under the parties' contract or West Virginia statutes) relating to *its* purchase of Raines Nissan as a "replacement" for Oldsmobile.  First, there is no evidence that GM threatened C&O with any "retaliation" as a result of this purchase.  To the contrary, GM did not object to C&O's purchase of Raines Nissan.  It was only when, and without waiting for GM's authorization, C&O moved Nissan operations into GM dedicated premises that GM raised an issue.  Second, C&O's witnesses have themselves established that GM acted within its rights in notifying plaintiff that C&O would be violating the parties' agreement by moving into and then selling Nissan vehicles out of the GM approved facilities.  Third, C&O now admits that GM never did terminate the Chevrolet Dealer Agreement, as it allegedly "threatened."  Finally, C&O cannot credibly maintain that GM "threatened" or "forced" it to create separate facilities for the Nissan dealership.  The undisputed record makes clear that C&O signed contracts with Nissan (well in advance of any "threatening" GM conduct) that required separate facilities and the exclusive marketing of Nissan products as part of C&O's relationship with Nissan.

Finally, C&O's Complaint fails because its claimed damages are not recoverable.  As a result of its purchase of a Nissan dealership to "replace" Oldsmobile, C&O is in a dramatically *better* position than if the Oldsmobile phase-out not occurred.  Moreover, by written agreement, C&O agreed to assume the Nissan renovation costs that it now claims as damages here.  Simply put, GM's conduct has not caused the plaintiff any economic harm.  Having reaped

the benefits of its mitigation efforts, as a matter of law, C&O cannot "double-dip" and seek further recovery from GM.

## STATEMENT OF FACTS

According to the Complaint, C&O and General Motors entered into a comprehensive, written Dealer Agreement that expressly defined the parties' manufacturer-dealer relationship in regard to the Oldsmobile line-make. (*See* Compl. ¶¶ 3, 6, 7)  This Dealer Agreement was effective as of November 1, 2000, and expired on October 31, 2005.  (Ex. A, C&O Motors' Dealer Sales and Service Agreement)  According to its terms, the Dealer Agreement formed the foundation of the parties' relationship and controlled over all other agreements. (*Id*. at Article 17.11)

The GM Dealer Agreement also contains key provisions that regulate how GM dealer facilities are to be maintained and that stipulate to the exclusive marketing, sales, and servicing of GM vehicles carried out from these facilities. (*Id.* at Art. 4.4.2.)

### The Oldsmobile Phase-Out Announcement

On December 12, 2000, GM announced that the Oldsmobile line-make would be phased out over the next several years. (Ex. B, December 12, 2000, Phase-Out Notification Letter.)  Although the Oldsmobile Division had been part of General Motors for many decades, Oldsmobile's poor sales record and mounting financial losses — even after GM's massive investment in new Oldsmobile products — simply made it economically unfeasible for GM to continue to manufacture the brand.  It was only after long and detailed analysis of Oldsmobile's bleak sales and financial situation that the phase-out decision was made.  Very shortly after that decision, on December 2, 2000, C&O, as well as every other Oldsmobile dealer, was notified of the phase-out decision. (*Id.*)

The Oldsmobile phase-out announcement was designed to give dealers the maximum possible notice of GM's plans and to be gradual enough so that they could transition their business over time.  (*Id.*)  GM notified Oldsmobile dealers that "Oldsmobile will continue to operate over the next several years and we will provide the kind of service and marketing support that Oldsmobile customers have come to expect."  (*Id.*)   In particular, Oldsmobile dealers were notified that "GM plans to continue to produce and sell current Oldsmobile products until the end of their current model life cycles" — life cycles which would take Oldsmobile's continued production years into the future. (*Id.*)  The vast majority of Oldsmobile dealers, like C&O, also sold other GM line-makes and they had several years to adjust their business to address the phase-out of the brand. (*Id.*)

In order to effect a smooth transition, on December 14, 2000, GM also notified Oldsmobile dealers of its Transitional Financial Assistance Program ("TFAP")   (Ex. C, December 14, 2000 TFAP Notification Letter.)  The TFAP program was a voluntary GM program which was "designed to assist Oldsmobile dealers in phasing out their Oldsmobile dealership operations." (*Id.*)  By its own choice, C&O is one of only eight Oldsmobile dealers nationwide — out of 2,800  — that has not yet elected to participate in the TFAP program.  In fact, Mr. James Love (principal of C&O Motors) rejected multiple invitations to discuss TFAP and the Oldsmobile phase-out with GM representatives because he did not want to sign a letter confirming that all agreements with respect to TFAP had to be in writing.  (Ex. D, Love Dep. 18:11-14, 37:2-8.)

### C&O Continued to Sell Oldsmobiles After the Phase-Out Announcement

After the phase-out announcement, ironically enough, C&O's Oldsmobile sales actually improved.  Indeed, following the announcement, C&O's sales of Oldsmobile *increased* substantially from the years before.  In calendar year 2000 (almost a full year before the

December 12, 2000, phase-out announcement), for example, C&O sold 163 Oldsmobiles; however, in 2001 — the year following the announcement — C&O sold a significantly higher amount. (Group Ex. E, Excerpts from C&O's Operating Report for 1999-2002.)[1] In 2002, C&O continued to sell more Oldsmobiles than it had the year prior to the announcement. (*Id.*) As Mr. Gene Walker — C&O's general manager — admitted under oath, C&O not only sold what GM "gave them" but C&O actually "bought extra" Oldsmobiles from GM following the phase-out announcement. (Ex. F, Walker Dep. 46:3-12.)

These "extra" Oldsmobiles were available to C&O in the years following the phase-out announcement because, as other Oldsmobile dealers elected to participate in TFAP, dealers were not ordering so many Oldsmobiles as before or were returning unused inventory to GM as they wound down their Oldsmobile operations. (*Id.*; Ex. G, Oldsmobile Order Summary from GMInventory.com; Ex. H, Affidavit of Patricia M. Anderson.)[2] Indeed, C&O had the opportunity to order Oldsmobiles from GM into 2005, the year C&O's Dealer Agreement expired according to its terms. (*Id.*)

### The Nissan Dealership Purchase

While significantly increasing C&O's Oldsmobile sales immediately following the phase-out announcement, C&O was also looking for other line-makes to add to its dealership portfolio. To that end, C&O purchased a Nissan dealership from Mr. Lester Raines at the end of 2001. (Ex. I, December 17, 2001, Letter from Paul Walker to Michael Westhoff.) Although plaintiff now claims that it bought the Nissan dealership "to replace Oldsmobile," C&O was

---

[1] These documents were produced by plaintiff during the course of this litigation and contain plaintiff's own statements (submitted to GM) about the number of vehicles it sold.

[2] Ms. Anderson's affidavit refers to an Exhibit A, which is the Oldsmobile Order Summary attached as Exhibit G hereto.

always looking to acquire additional dealerships to fill available space on its considerable real estate holdings in St. Albans:

> Q.     Why did you want the Nissan franchise?

> A.     Well, you want any franchise you can get if you've got room to put it.  If you got buildings and space, you go out and find a unit to put in them.

(Ex. D, Love Dep. 77:10-14.)

Regardless of how the acquisition is characterized, however, a central issue emerged concerning the Nissan dealership:  would the Nissan facility be physically separated from C&O's GM operations?  This was obviously important to GM, as it would be for any manufacturer, because GM wanted the Chevrolet part of C&O's business to be separate from a competitor's operations (*e.g.*, Nissan's operations).  Moreover, the parties had agreed — in writing — that GM had the full right to receive written notice in advance of a proposed change in facilities and the full right to object to any changes to the Chevrolet facility if a competitor was added:

> If Dealer wants to make any change in location(s) or Premises, or in the uses previously approved for those Premises, Dealer will give General Motors written notice of the proposed change, together with the reasons for the proposal, for General Motors evaluation and final decision in light of dealer network planning considerations.  No change in location or in the use of Premises, ***including addition of any other vehicle lines***, will be made without General Motors prior written authorization pursuant to its business judgment.

(Ex. A, Dealer Agreement Article 4.4.2) (emphasis added.)

To that end, and recognizing GM's contractual rights, on December 17, 2001, C&O notified Michael Westhoff, GM's Zone Manager for West Virginia, of C&O's planned purchase of Raines Nissan and its intent to "keep GM and Nissan sales departments totally separated."  (Ex. I, December 17, 2001, Letter from Paul Walker to Michael Westhoff.)  Mr.

Walker informed Mr. Westhoff, however, that Nissan and Chevrolet would not be separated immediately; instead, it would take two years to renovate another C&O building for Nissan and effect the separation. (*Id*.) Then, without waiting for a written authorization from GM regarding its addition of the Nissan dealership to the GM facilities, C&O simply moved Nissan into the GM facilities and began selling Nissan vehicles out of the GM facilities. (Ex. J, April 17, 2002 Letter from Michael Westhoff to C&O Motors; Ex. F, Walker Dep. 130:11-131:5.)

On April 17, 2002, Mr. Westhoff notified C&O by letter that, in light of C&O's unauthorized addition of the Nissan dealership, C&O was in breach of the Dealer Agreement. (*Id*.) Mr. Westhoff, however, provided C&O with an opportunity to cure. C&O was sent a letter agreement, by which it could complete the separation of GM and Nissan facilities by December 17, 2003. (*Id*.; Ex. D, Love Dep. 148:21-149:5.) Mr. Love — advised by counsel — reviewed and initialed the letter agreement and mailed it to GM's Dealer Contractual Group, where it was received on June 10, 2002. (Ex. D, Love Dep. 152:7-153:3; Ex. J, April 17, 2002 Letter from Michael Westhoff to C&O Motors.)

Importantly, in this April 17, 2002, letter agreement with GM, C&O stipulated in writing that the Nissan renovation costs would be the responsibility of C&O alone. (*Id*.) According to the letter agreement, C&O agreed to assume all costs "incurred to accomplish the separation or removal of Nissan dealership" and that "GM shall have no liability or obligation to compensate Dealer for such expenses or costs." (*Id*.) Thus, GM agreed to provide a significant period of time for C&O to separate the Nissan and GM facilities.

### The Nissan Dealer Agreement

On December 21, 2001, C&O executed a Dealer Term Sales & Service Agreement with Nissan. (Ex. K, Nissan Dealer Term Sales & Service Agreement.) By this Agreement, C&O agreed with Nissan that C&O would keep Nissan products separated from

7

Nissan's competitors. Thus, the Nissan agreement unequivocally requires C&O to renovate its "Dealership Facilities so as to provide *exclusive Nissan dealership facilities* . . . ." (Ex. L, Addendum to Nissan Dealer Term Sales & Service Agreement; *Id.*) C&O has signed subsequent agreements with Nissan that further stipulate that failure to create separate facilities "shall constitute a material breach" of the Nissan dealer agreement. (Ex. M, January 9, 2004 Letter From M. McConnell to James Love III, Amendment 1 at p. 2.) Thus, separate facilities — the cost of which C&O now wants GM to pay in this action — were also required by Nissan, to which C&O agreed.

### The Success of the Love Nissan Dealership

Since C&O purchased it, the Nissan dealership ("Love Nissan") has been a prodigious seller of vehicles. During 2002 through 2005, C&O Motors reported over 2,000 new Nissan unit sales, with an average of over 500 Nissan vehicles per year. (Group Ex. N, Excerpts from C&O's Nissan Operating Reports for 2002 to 2005.) By contrast, for the two-year period leading up to the phase-out announcement (*i.e.*, 1999 to 2000), C&O sold under 200 Oldsmobiles per year. (Ex. E, Excerpts from C&O's Operating Report for 1999-2002.) Indeed, C&O remains the largest Nissan dealership in the state of West Virginia. (Ex. D, Love Dep. 73:17-19.) Nonetheless, from 2002 to 2003, C&O continued to commingle Nissan's large-volume operations with its GM operations (*i.e.*, Oldsmobile and Chevrolet operations). Indeed, C&O even failed to meet agreed-upon separation date of December 17, 2003, in violation of the signed letter agreement; GM, however, did not declare a breach. (Ex. F, Walker Dep. 129:14-21.)

### The Non-Renewal of the Oldsmobile Dealer Agreement

GM's planned phase-out of the Oldsmobile brand was slow and gradual, as GM had planned and as its dealers had been so advised. Nearly four years after the announcement (*i.e.*, October 27, 2004), and nearly three years after C&O acquired the Nissan dealership, GM

issued a 12-month notification letter concerning Oldsmobile. (Ex. O, October 27, 2004 Twelve-Month Notification Letter.) This letter advised C&O of "General Motors' intent not to renew the Oldsmobile Dealer Sales and Service Agreement currently in effect between C&O Motors, Inc., and General Motors upon its expiration on October 31, 2005." (*Id.*) In doing so, GM provided C&O the twelve-month statutory notice required in West Virginia when "a manufacturer or distributor discontinues production of the new motor vehicle dealer's product line or discontinues distribution of the product line in this state." W. Va. Code § 17A-6A-7(d). Plaintiff stipulates that it received proper and timely notice of non-renewal. (Ex. D, Love Dep. 34:1-6.) After receiving the 12-month notification letter, C&O continued to sell and service Oldsmobiles until the expiration of its Dealer Agreement on October 31, 2005. (*See* Compl. ¶ 6.)

### Plaintiff's Admission on Absence of a Statutory Breach

At deposition, and at a subsequent hearing before this Court (on September 28, 2006), plaintiff expressly conceded that C&O's statutory and contractual claims in this case are not based on non-renewal of the Oldsmobile Dealer Agreement or the business decision to phase-out the Oldsmobile brand.    Regarding the statutory claim, C&O's counsel has acknowledged:

> I don't think that we have asserted a statutory claim predicated upon termination of the Oldsmobile line. I certainly didn't intend to make -- so if that's another concern you have, we're not, there's a statute that says you can do [the Oldsmobile phase-out]. That's the way I read it. We're not heading down that particular path.

(Ex. D, Love Dep. 171:13-19).    Relatedly, C&O has admitted that the West Virginia statute permits GM's alleged conduct in this regard: "[U]ltimately ***under the statute*** GM had a right to pull the plug on the line of cars and they did it . . . . there's a statute that says you can do it." (*Id.* at 171:9-18.) (emphasis added.)

9

### Plaintiff's Admission on Absence of a Contractual Breach

Regarding C&O's contractual claim, Mr. Love has expressly admitted that GM did not breach any provision of the contract at issue (*i.e.*, the Dealer Agreement):

> A.      Did they breach my Chevrolet sales and service agreement?
>
> Q.      Or your Oldsmobile agreement?
>
> A.      Or my Oldsmobile agreement.  No, I'm not aware of any.

(*Id.* at 160-161.)   Indeed, C&O has admitted that GM had "contractual rights" to phase-out Oldsmobile: "GM had a right to pull the plug on the line of cars and they did it . . . . they have ***contractual rights*** to that . . . . " (*Id.* at 171); "Q. Do you agree that General Motors has the right to phaseout an unprofitable division.  A. Yes." (*Id.* at 45.) (emphasis added.)

### The Claims that Remain

Notwithstanding these dispositive admissions and record evidence, plaintiff's counsel has explained that C&O is still alleging the following claim in this litigation:

> The complaint of Oldsmobile in a nutshell is, I believe, it was August of '04 we didn't get anymore.  And we still had more than a year to go in the contract.  I mean, that's the complaint in this case that we're asserting . . . . They breached their contract.  They stopped giving us cars in August of '04.

(*Id.* at 169-170.)   Moreover, in other conversations, confirmed in correspondence, plaintiff's counsel has acknowledged that C&O continues to pursue a claim related to GM's reaction to C&O moving Nissan operations into the GM-approved facilities.  (*See* Ex. P,  Correspondence from M. Lillie to M. Swartz.)  This claim, and expenses related to the Nissan acquisition and renovation, are expressed in Count I (violation of the West Virginia dealer statute), Count II (anticipatory breach of contract) and Count III (breach of contract) of C&O's Complaint.

## ARGUMENT

## I.   C&O HAS NO CLAIM FOR A FAILURE TO DELIVER VEHICLES AFTER AUGUST 2004.

C&O alleges that "[a]fter August of 2004, GM has failed to provide any new Oldsmobile cars to C&O for sale to the public" and that this amounts to a breach of contract. (Cmplt. ¶ 38.) This allegation is flatly contradicted by the facts.

There is absolutely no evidence that GM ever failed to deliver an Oldsmobile order or that, as C&O alleges, GM "stopped giving us cars in August of '04." (Ex. D, Love Dep. 169:14-170:12.) First, Mr. Love himself, when pressed at deposition, could not recall or identify any instances in which GM did not honor an order. (*Id*. at 162:15-24.) Mr. Walker, similarly, could not testify that GM ever failed to deliver an Oldsmobile order, excluding the market variables every dealership in the United States experiences: "They worked out giving us some cars out of a pool that they had. But I'd say there was a lot of times we asked for vehicles they couldn't build. But the same thing holds true for Chevrolet. I mean they can't build everything you want." (Ex. F, Walker Dep. pp. 145:15-20.) Nor has plaintiff been able to identify or produce any document sent to GM that complains about a failure to deliver Oldsmobile vehicles.

Indeed, contrary to plaintiff's allegations, but consistent with its sworn testimony, C&O did in fact have the opportunity to order Oldsmobiles from GM up through 2005. (Ex. G, Oldsmobile Order Summary from GMInventory.com.) In conjunction with the phase out of Oldsmobile Division, GM made special arrangements for Oldsmobile dealers to order new Oldsmobile vehicles from GM through GM's inventory website. (Ex. H, Affidavit of Patricia M. Anderson.) The website listed available new Oldsmobile vehicles located throughout the United States and provided the dealer with the vehicle identification number ("VIN"). (*Id*.) With the VIN, the dealer could view the vehicle type, invoice and other information to assist the dealer in

11

selection and ordering. (*Id.*)  Once the vehicle was ordered by the dealer via the website, GM invoiced the dealer and arrangements were made to physically ship the vehicle from its location to the ordering Oldsmobile dealer's location or have the dealer pick it up. (*Id.*)

GM's Oldsmobile website was an unqualified success; in fact, a total of 2,822 new Oldsmobile vehicles were sold to Oldsmobile dealers just between 2002 and 2005. (Ex. G, Oldsmobile Order Summary from GMInventory.com; Ex. H, Affidavit of Patricia M. Anderson.) In 2004, a total of 1,240 such vehicles were sold under this process by GM to Oldsmobile dealers; in 2005, the number of such new Oldsmobile vehicles sold to dealers by GM was 276. (Ex. H, Affidavit of Patricia M. Anderson.)  C&O, like any other Oldsmobile dealer, had the opportunity to order these new Oldsmobile vehicles. (*Id.*)  In fact, C&O, dealer code #09091, actually ordered and received new Oldsmobile vehicles pursuant to GM's website process on four separate occasions in 2003 and 2004.   (Ex. G, Oldsmobile Order Summary from GMInventory.com;  Ex. H,  Affidavit of Patricia M. Anderson)   Being familiar with this Oldsmobile website, there is no reason why C&O could not have continued ordering — and receiving — new Oldsmobile vehicles up through 2005, as other Oldsmobile dealers did.  C&O simply decided not to order anymore Oldsmobiles.  Tellingly, Mr. Walker was not aware of any specific customer who wanted an Oldsmobile car that C&O couldn't deliver. (Ex. F, Walker 147:5-7.)  The claim that "after August 2004 GM failed to provide any new Oldsmobile cars to C&O" simply rings hollow. (Cmplt. ¶ 38.)

Moreover, it is important to note that C&O's Complaint does not cite any contractual provision as a basis for this claim.  The only provision this claim can possibly be based upon is Article 6.1, which provides, in pertinent part, as follows:

> General Motors will endeavor to distribute new Motor Vehicles among its
> dealers in a fair and equitable manner.  Many factors affect the availability

and distribution of Motor Vehicles to dealers, including component availability and available production capacity, sales potential in Dealer's Area of Primary Responsibility, varying consumer demand, weather and transportation conditions, governmental regulations, and other conditions beyond the control of General Motors.  General Motors reserves to itself *discretion* in accepting orders and distributing Motor Vehicles, and its judgments and decisions are final.

(Cmplt. Ex. A, § 6.1, at 8) (emphasis added).

C&O still cannot state a claim under this anti-discrimination provision because it merely requires that GM "distribute new Motor Vehicles *among* its dealers in a fair and equitable manner." (Compl. Ex. A, § 6.1, at 8) (emphasis added).  Here, because it is undisputed that the Oldsmobile phase-out applies to all Oldsmobile dealers equally, there can be no allegation of the discriminatory conduct that this provision prohibits.  In other words, because there is no allegation that GM's phase-out announcement caused an inequitable distribution of Oldsmobile vehicles by GM among Oldsmobile dealers, C&O's Complaint fails to allege a breach under Article 6.1.

Mr. Love, in fact, expressly acknowledged the absence of any such inequitable distribution: "Q: You understand that when General Motors decided to phase out the Oldsmobile division that that discontinuation of the line make was being done on a nationwide basis, correct? A. Yes." (Ex. D, Love Dep. 41:22-42:2); "But you understand that the announcement with respect to Oldsmobile, the correspondence about Oldsmobile, the timeframe over which it was implemented was applied equally to all dealers, correct? A. By somebody." (*Id.* at 42:18-23.) Similarly, Mr. Walker had no knowledge of discriminatory behavior:

"Q.    Do you have any evidence or any facts that you can testify to where your dealership was treated differently from some other Oldsmobile dealership in the state of West Virginia with respect to Oldsmobile?

A.    Not that I know of." (Ex. F, Walker Dep. 147:23-148:4.)

13

The record evidence in this case convincingly demonstrates that C&O was not deprived of any Oldsmobile orders, any claim related to this issue should be dismissed.

## II.    THERE CAN BE NO CLIAM RELATED TO GM'S RESPONSE TO C&O'S NISSAN ACQUISITION.

C&O cannot transform its purchase of a Nissan dealership (to which GM obviously had no objection) and subsequent relocation of those dealership operations onto GM's dedicated facilities as a valid legal claim.  In its Complaint, C&O makes a great deal out of the fact that "GM threatened dealership termination, i.e. termination of the remaining Chevrolet line, if C&O did not completely separate the Nissan dealership it acquired to mitigate its losses . . . ." (Cmplt. ¶ 16.)  Similarly, C&O complains that GM "required [it] to expend substantial sums to purchase and refurbish sales and service facilities, and to hire additional personnel to operate its Nissan operations." (*Id.* at ¶ 15.)

First, there is no evidence of GM conduct that would rise to the level of "threatening" termination of the Chevrolet dealer agreement.  To the contrary, the ***only*** communication upon which plaintiff relies was simply a notification, received in April of 2002, whereby GM informed C&O that it would be in breach of the Dealer Agreement by not separating the competing dealerships, as well as the contractual consequences of that breach if not cured.  (*See* Ex. J, "As we discussed, the addition of Nissan without the prior written approval of GM is a material breach of [the Dealer Agreement] and, if not cured, grounds for termination of the Dealer Agreement"; Ex. D, Love Dep. 161:4-20.)  Plaintiff does not (and cannot) dispute that the "threatening" letter agreement simply sets forth what GM was entitled to pursuant to written agreement.  Indeed, C&O's key witnesses have conceded that, under the Dealer Agreement, "General Motors, as a matter of contract, has the right to insist . . . [that] the Nissan facility is separate from the Chevrolet facility . . . ."  (Ex. F, Walker Dep. 127:2-24.)

Finally, GM agreed to exactly what Mr. Walker requested in his initial letter — a period of two years in which to provide separate Nissan facilities. (*See* Ex. I.)

Furthermore, to claim that GM threatened C&O with termination and forced the plaintiff to expend moneys on separation is disingenuous in light of the agreements C&O signed with Nissan. Those agreements (produced by C&O on September 27, 2006 after a hearing on GM's Motion to Compel) make clear that *Nissan* also required C&O "provide exclusive Nissan dealership facilities." (Ex. L, Addendum Nissan Dealer Term Sales and Service Agreement.) The Nissan Dealer Agreement was signed immediately upon Love's purchase of the Nissan facility in December of 2001. (*Id.*) Thus, in December 2001, C&O had already agreed with Nissan that it *had to* provide exclusive Nissan facilities as part of its bargain with Nissan to get the right to sell Nissan vehicles. *This agreement came four months before the allegedly "threatening" letter from GM, which requested a similar separation.* At the end of the day, C&O's complaints about GM forcing it to incur separation expenses fail, as it had already agreed to (equally strong) Nissan exclusivity requirements.

Based on this record, C&O has failed to identify any specific term in its written contract with GM that GM breached in this regard, or any specific provision in the West Virginia statutes that GM violated. Accordingly, GM is entitled to summary judgment on this claim and Counts I, II, and II should be dismissed.

## III.   REGARDLESS OF ANY LIABILITY THEORY, C&O'S CLAIMED DAMAGES ARE NOT RECOVERABLE AS A MATTER OF LAW.

Plaintiff's entire damages theory here is that GM is somehow liable for the "mitigation" efforts that C&O has undertaken to replace Oldsmobile. More specifically, plaintiff alleges it is entitled to all the expenses it incurred in obtaining a "replacement" line-make "for" Oldsmobile (*i.e.*, Nissan) and remodeling a building to house the operations of that line-make.

Plaintiff itemizes these expenses roughly as follows: $1,013,920 for the purchase of the Nissan dealership, $526,641 for renovation and furniture expenses, $269,917 for rent, and $662,978 for statutory interest, for a total of $2,473,456 in damages.[3]   (Ex. Q., Expert Report of Selby, Epperly & Associates.)  While GM has questions about some of these expenses, for purposes of this motion only, they can be assumed to have been incurred.  However, even assuming their accuracy, as a matter of law, these expenses are still not recoverable.

The problem with plaintiff's theory is that the undisputed record in this case shows that C&O actually bettered its condition by acquiring the Nissan line make.  Indeed, the plaintiff is in a dramatically *better* position than had GM's alleged conduct not occurred.  The Tenth Circuit recently decided a vehicle dealership case that involved circumstances identical to the case here and denied recovery to plaintiff as a matter of law.  *See Jackson v. Volvo Trucks No. Amer., Inc.* 2006 WL 2441434 (10th Cir. Aug. 24, 2006).

In *Jackson*, the plaintiff-dealer invested $400,000 in a dealership which, he claimed, he would not have done but for the alleged conduct of Volvo.  However, the dealer subsequently sold the stock of this dealership for $1,000,000.  The Tenth Circuit, accordingly, dismissed the dealer's claims on summary judgment:

> Based on this record evidence, the district court concluded that Jackson suffered no injury in fact.  To the contrary, his investment resulted in a net gain of at least $600,000, instead of a loss. . . .  Accordingly, we conclude Jackson has failed to demonstrate a genuine issue of material fact with regard to his alleged loss and Volvo is entitled to summary judgment on these claims.[4]

---

[3]   As demonstrated above, all these facility and remodeling expenses were required by Nissan when C&O signed the Nissan dealer agreement.

[4]   This point is further bolstered by learned treatises.  *See, e.g.,* WILLISTON ON CONTRACTS, Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts, § 64: 27, 196 (4th ed. 2002) (Where a plaintiff has replaced the value of goods or services alleged to have been lost, it has been made whole); *also* RESTATEMENT (SECOND) OF CONTRACTS: Availability of Damages, Substitute Transactions, § 350(c) (1981) ("When a party's breach consists of

(*Id*. at 7-8.)

Similarly, here, C&O's claimed damages arise entirely from the purchase and renovation of the Nissan dealership, the expenses of which C&O claims it incurred to "replace" the Oldsmobile dealership. C&O's expert has opined that C&O's "replacement" damages are $2,473,456. However, Mr. Love's current valuation of the Love Nissan Dealership is double, if not triple, this figure. Indeed, Mr. Love has testified that Love Nissan's "blue sky" alone is worth "two and a half million" dollars or, in other words, at least two times the one million dollars he originally paid in goodwill for the Nissan dealership. (Ex. D, Love Dep. 50:15-20.)

Mr. Love also testified that the entire Love Nissan dealership would be worth approximately five million dollars today: "The business and the tools and the equipment and the franchise would be worth five million." (*Id*. at 51:6-8.) Mr. Love even testified that he might not accept ***eight million dollars*** for his Nissan dealership today.[5] (*Id*. at 101:17-22.) There has been no lack of opportunity for Mr. Love to sell the Love Nissan dealership. Mr. Love, himself, testified that it was only a matter of days after he purchased Nissan before he received his first offer. (*Id*. at 98:18-24.)

Based on Mr. Love's own valuations of C&O's Nissan dealership, C&O cannot demonstrate a genuine issue of material fact with regard to its alleged damages because it has suffered "no injury in fact." *See, also, Johnson v. Acceptance Insurance Co.*, 292 F. Supp. 2d 857, 868 (N.D. W. Va. 2003) (insurance company granted summary judgment because plaintiff

---

a failure to deliver goods or services, for example, it is often possible for the injured party to secure similar goods or services on the market.")

[5] A simple hypothetical illustrates the incredible nature of C&O's damages claim. If Mr. Love had accepted an five-million-dollar offer for Nissan in 2005, he would not be able to claim in 2006 that C&O's "replacement" purchase of Nissan in 2001 caused it any damage, given that C&O's profits would have at least doubled C&O's claimed damages (*i.e.*, $5,000,000 minus $2,473,456). The result is not changed by the fact that C&O has elected to keep its very profitable Nissan dealership, which Mr. Love values today as being worth from $5,000,000 to $8,000,000.

successfully obtained insurance coverage from another insurance company and, thus, plaintiff could not demonstrate a genuine issue of material fact with regard to its alleged damages.)  In short, C&O cannot recover the "damages" it seeks as a result of the Oldsmobile phase-out because the assets it acquired — the Nissan dealership and related facilities — are undisputedly worth far more than C&O paid for them and C&O is in a far better position now than if the phase-out never occurred.  Accordingly, GM should, as in *Jackson*, be entitled to summary judgment on both C&O's statutory and contract claims due to the absence of any recoverable damages.

Finally, C&O is independently precluded from recovering any costs associated with the renovation of a building to house the "replacement" Nissan business (about $526,000 for renovation, $269,000 for related rent, and a proportionate amount of prejudgment interest). The reason is that C&O had already **agreed to assume** all such costs associated with Love Nissan's new facilities as a matter of written contract with GM.[6]

GM did not proceed with its contractual rights with respect to C&O's breach of Article 4.4.2 of the Dealer Agreement by commingling dealerships. Rather, in the April 17, 2002 letter agreement executed between GM and C&O, C&O agreed to address the breach and C&O expressly stipulated that C&O — not GM — is liable for any such costs:

> Assumption of Costs.  Dealer agrees that any costs or expenses incurred to accomplish the separation or removal of Nissan dealership operations from the premises of C&O Motors' Chevrolet and Oldsmobile dealership will be the sole responsibility of Dealer, and GM shall have no liability or obligation to compensate Dealer for such expenses or costs.

---

[6] Of course, Nissan had already required C&O to separate these facilities,  thus requiring the expenditure of these funds regardless of GM's conduct.

(Ex. J, April 17, 2002 Letter from Michael Westhoff to C&O Motors.)   This clear agreement precludes C&O's current attempt to obtain as "damages" these very costs.  C&O cannot undo the terms of this agreement and seek to recover these costs from GM.

On both the facts and the law, plaintiff's damages theory fails

## CONCLUSION

For the foregoing reasons, C&O Motors' claims fail as a matter of law. Accordingly, defendant General Motors Corporation respectfully requests that the Court grant it summary judgment on Counts I, II and III of plaintiff's Complaint.

Dated:  October 2, 2006                        Respectfully submitted,

THE TINNEY LAW FIRM, PLLC

John H. Tinney  (WV State Bar #3766)
John H. Tinney, Jr. (WV State Bar #6970)
Chase Tower, 14th Floor
707 Virginia Street, East
Charleston, WV  25337-3572
Telephone: (304) 720-3310

**KIRKLAND & ELLIS LLP**
Mark S. Lillie
Joseph Russell
200 East Randolph Drive
Chicago, IL  60601
Telephone:  (312) 861-2000

**ATTORNEYS FOR DEFENDANT
GENERAL MOTORS CORPORATION**



**IN THE UNITED STATES DISRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

C&O MOTORS, INC.
a West Virginia corporation,

   Plaintiff,

v.         Case No. 2: 05cv0835

GENERAL MOTORS CORPORAITON,
a Delaware corporation,

   Defendant.

<u>**CERTIFICATE OF SERVICE**</u>

   I, John H. Tinney, Jr., counsel for Defendant, hereby certify that on the 2nd day of October, 2006, the foregoing **"Defendant General Motors' Motion for Summary Judgment"** and **"Memorandum in Support of General Motors Corporation's Rule 56 Motion for Summary Judgment"** were served upon plaintiff by depositing a true copy thereof in the United States First-Class Mail, postage prepaid, and addressed to counsel as follows:

     Mark A. Swartz, Esquire
     Swartz & Stump, L.C.
     803 Quarrier Street
     Suite 500
     P. O. Box 673
     Charleston, WV  25323-0673
     *Counsel for Plaintiff*

            John H. Tinney, Jr. (WV State Bar #6970)