UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

at Charleston

| | |
|---|---|
| C&O MOTORS, INC., <br> a West Virginia corporation, <br><br> Plaintiff, <br><br> vs. <br><br> GENERAL MOTORS CORPORATION, <br> a Delaware corporation, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No.: 2:05-CV-00835 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**FILED OCT 2 6 2006 — TERESA L. DEPPNER, CLERK, U.S. District Court, Southern District of West Virginia**

## GENERAL MOTORS CORPORATION'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

At the outset, it is important to note that C&O concedes that the instant case now consists of essentially two claims. First, C&O alleges that GM violated West Virginia law and the parties' contract when, in late "calendar year 2004," GM ceased to provide it with new Oldsmobiles. (Opp. at 4, 6.) Second, C&O argues that when it bought a Nissan dealership in 2001 allegedly to "replace" Oldsmobile, GM allegedly forced it to play "a game of musical buildings," by taking the position that C&O not sell Nissan's products in its approved Chevrolet dealership. (Opp. at 4.)

Though plaintiff has admitted that its claims are (dramatically) limited, it still does not identify a single clause of the parties' contract or provision of the West Virginia statutes that GM's alleged conduct violated. For example, plaintiff refers to a litany of contract terms "at this early juncture, relevant to the contract claims," but completely fails to explain how GM violated any specific provision. (*Id.* at 5.) Similarly, plaintiff

reprints large tracts of the West Virginia Dealer Statute, without specifically enumerating how GM's conduct ran afoul of any provision. With virtually no citation to the factual record, and limited reliance upon case law, C&O has not met its required burden to create a disputed issue of material fact.

## I. C&O'S STATUTORY CLAIMS ARE UNTIMELY.

While plaintiff's opposition largely focuses upon GM's Motion for Summary Judgment, it does attempt to submit "comments" to the cases cited by GM in its previously filed Motion to Dismiss. (*See* 10/16/06 Letter from Plaintiff's Counsel Mark Swartz to Judge Copenhaver.) The parties have now agreed to execute a stipulation (filed with the Court 10/25/06) by which plaintiff has agreed to limit its claims. Under the terms of the stipulation, GM agrees to withdraw its Motion to Dismiss--with one exception. GM does not retract its motion to the extent it seeks dismissal of plaintiff's statutory claims (encompassed in Count I of its complaint) for being time barred.

As the complaint acknowledges, GM gave written notice of the non-renewal of the Oldsmobile dealer agreement to C&O on October 27, 2004. (*See* Compl. ¶ 26.) Section 17A-6A-7 of the West Virginia Motor Vehicle Code provides that "any motor vehicle dealer who receives a notice of intent to discontinue, cancel or not renew a dealer agreement may, ***within a one hundred twenty-day notice period***, file a petition or complaint for a determination of whether such action is an unfair or prohibited discontinuation, cancellation or nonrenewal." W. Va. St. Ann. § 17A-6A-7(e) (emphasis added).

For C&O, that 120-day period expired on February 24, 2005. However, it did not file its complaint until September 14, 2005, more than six months after the statutory deadline. Moreover, GM had given C&O nearly four years of notice of its intentions

2

when it advised all dealers (including C&O) on December 12, 2000 of the planned phase-out of Oldsmobile. (Ex. B to Mot. for S. J.) C&O can hardly argue that it was surprised when it received the non-renewal notice in 2004. Indeed, a central component of C&O's claim here relates to its purchase of a Nissan dealership (in December of 2001) allegedly to "replace" Oldsmobile. (Opp. at 4.)

Plaintiff cannot avoid enforcement of the time bar imposed by the West Virginia statutes by claiming that it is not "really" advancing claims premised on the non-renewal of Oldsmobile. This argument is disingenuous. Without the non-renewal of Oldsmobile, this case would not exist. Indeed, none of plaintiff's claims and damages (*i.e.*, its allegations about the failure to supply Oldsmobiles, its purchase of a "replacement" Nissan dealership, and relocation costs associated with moving Nissan operations from the GM building) could be brought but for GM's decision to phase-out Oldsmobile, discontinue production of Olds vehicles, and not renew C&O's dealership agreement.

The bottom line is that C&O missed the statutory deadline for filing its complaint by ***more than six months***. As a matter of law, all of its statutory claims (Count I) are time-barred under W. Va. St. Ann. § 17A-6A-7(e) and should be dismissed upon this undisputed factual record.

## II. C&O STILL HAS NO CLAIM FOR A FAILURE TO DELIVER VEHICLES.

C&O cannot transform its failure to order vehicles into a cause of action against GM under either the parties' dealer agreement or West Virginia Statutes.

### A. GM Did Not Breach Any Provision of the Dealer Agreement.

C&O's complaint alleges that "[a]fter August of 2004, GM has failed to provide any new Oldsmobile cars to C&O for sale to the public" and that this amounts to a breach

3

of contract.[1] (Compl. ¶ 38.) The dealer agreement, however, does not require that GM provide cars to C&O. Rather, Article 6.1 of the agreement grants GM wide discretion in "accepting *orders* and distributing Motor Vehicles . . . ." (Ex. A to Mot. for S.J. (emphasis added).) Gene Walker has admitted that C&O *never ordered* any more Oldsmobiles after May of 2004. (*See* Ex. A, Aff. of Gene Walker at ¶ 9.)[2]

In its opposition, C&O recognizes its failure to make any orders and now argues that the Dealer Agreement required GM to manufacture 2005 model Oldsmobiles and "gave C&O the right to buy" these 2005 vehicles. (Opp. at 7.)[3] However, C&O does not cite to a specific provision of the Dealer Agreement that supports this rephrased allegation.[4] That is because no such provision exists. The bottom-line fact, which C&O fails to rebut, is that new Oldsmobiles were available to be ordered and delivered into 2005, through a system established by GM to keep new Oldsmobile vehicles available to dealers while the phase-out was under way. (*See* Mem. in Support of S.J. at 12.) Rather,

---

[1] It is important to note that, though plaintiff makes an unsupported assertion that its Oldsmobile sales "ran equal" (Opp. at 3) to that of its other line-makes, Oldsmobile comprised a very small portion of C&O's overall business and sales. (*See, e.g.,* Ex. E. to Mot. for S.J.)

[2] The fact that plaintiff failed to order more Oldsmobiles makes sense when viewed in tandem with the facts. As of 2004, C&O was selling more "replacement" Nissans than Oldsmobiles. (Mot. for S. J., Ex. N, Excerpts from C&O's Nissan Operating Reports for 2004 and 2005.)

[3] In its opposition, plaintiff also complains that GM failed to honor a purported obligation "to permit each dealer the opportunity to achieve a reasonable return on investment . . . ." (Opp. at 6). Plaintiff's claim, however, misconstrues Article 4.1, which states that "dealers must be appropriate in number, located properly, and have proper facilities to represent and service General Motors products competitively and to permit each dealer the opportunity to achieve a reasonable return on investment . . . ." (Ex. A to Mot. to S.J., Dealer Agreement § 4.1 at 2.) Plaintiff appears to argue that this language imposes some sort of affirmative obligation upon GM. It does not. Instead, this language merely sets forth the necessity of an effective dealer network. If it imposes any obligation, it is not upon GM, but upon C&O itself, the subject of the sentence clause at issue: The "*dealers must* . . . have proper facilities . . . to permit each dealer the opportunity to achieve a reasonable return on investment." (Ex. A to Mot. for S.J., § 4.1 at 2 (emphasis added).)

[4] Indeed, plaintiff does not even reference a *single* contract provision in pages 6-10 of its opposition (which deals with its "failure to deliver" claim).

4

C&O argues that there were not enough Oldsmobiles available for order or that the Oldsmobiles available were not of a type it desired. (Opp. at 7-8.)[5] However, this argument misses the mark and does not address the fact that Oldsmobiles were available for delivery. C&O simply failed to order any vehicles and now wishes to blame GM.

### B. GM Did Not Violate Any Provision of the West Virginia Statute.

To the extent that C&O seeks a statutory hook for its "failure to deliver" claims, those efforts also fail. In its opposition, C&O relies principally upon W. Va. St. Ann. § 17A-6A-10(2)(a).[6] (Opp. at 8.) That provision makes clear that a manufacturer may not unreasonably refuse to honor a motor vehicle dealer's order for new vehicles. (*Id.*) Aware that it has made no order of vehicles, and perhaps in an effort to cure this deficiency, plaintiff once again seeks to shift its claim. According to C&O, the fact that GM discontinued production of Oldsmobiles in April 2004, constitutes a *per se* violation of the West Virginia Code and the basis for a "failure to deliver claim." (Opp. at 7-9.)

However, this argument overlooks the purpose of the Dealer Statute and the facts of this case. Indeed, the relevant provision of the Dealer Statute makes clear that a "failure to deliver" claim must be based upon unreasonable conduct on the part of a manufacturer such as GM. W. Va. St. Ann. § 17A-6A-10(2)(a) (no violation if orders exceed quantities "reasonably and fairly allocated"; no violation where failure to deliver "beyond control" of manufacturer). Here, plaintiff has repeatedly admitted that GM's decision to phase-out Oldsmobile and discontinue the production of new vehicles was reasonable. Indeed, plaintiff acknowledges that **"under the statute, GM had a right to**

---

[5] Plaintiff actually uses more colorful language, describing the Oldsmobiles available for order as "factory mistakes." (Opp. at 6.) There is no record evidence to support this assertion.

[6] In its opposition, C&O mistakenly cites to W. Va. Code § 17A-6A-10(2)(g).

5

*pull the plug on the [Olds] line of cars and they did it…there's a statute that says you can do it.*" (Ex. D. to Mot. for S.J., Love Dep. at 171:9-18) (emphasis added). C&O cannot now undo its admissions and hold GM responsible for conduct it has acknowledged to be fully sanctioned by law.

### III. C&O'S ARGUMENTS CANNOT SALVAGE ITS NISSAN FACILITY RENOVATION CLAIM.

Plaintiff does not dispute that GM was within its contractual rights to insist that C&O's newly acquired Nissan facilities be separate from its Chevrolet operations. (*See*, Ex. F to Mot. for S.J., Walker Dep. 127:2-24, "General Motors has the right to insist [that] the Nissan facility is separate from the Chevrolet facility ….."; Ex. A to Mot. for S.J., Dealer Agreement §13.1.5, "any change of use by dealer of any dealership premises . . . without the prior written approval of General Motors" a breach of the parties' agreement.) Nor does plaintiff explain away the fact that it *agreed with Nissan* to build separate facilities for Nissan when it signed its first Nissan Dealer Agreement with that manufacturer *months prior to any alleged threatening conduct on the part of GM.*[7] (*See* Ex. L to Mot. for S.J., Addendum to Nissan Dealer Term Sales and Service Agreement.)

Instead, plaintiff makes a series of arguments that are unsupported by the law and based upon mere speculation. First, C&O boldly (and inexplicably) asserts that, though the unambiguous terms of the Nissan agreement require separate facilities, "appearances can be deceiving." (Opp. at 12.) C&O next offers the unvarnished speculation of its General Manager, who claims in a supporting affidavit, that it was his belief that "Nissan

---

[7] With respect to GM's alleged threatening conduct, GM invites the Court to review the letter that comprises the sole basis for plaintiff's assertion. (Ex. J. to Mot. to S.J.) That letter specifically states that plaintiff acted without "prior written approval" and its actions, "*if not cured*," would amount to a material breach. (*Id.*) (emphasis supplied). In order to accept plaintiff's theory that this letter constituted a "threat," this Court must equate the threat of termination with a party seeking enforcement of a contract term agreed to by plaintiff. Quite simply, there is no legal basis for such a conclusion.

6

would have allowed us to share facilities with GM." (Ex. A to Opp. to S.J., Walker Aff. ¶ 10.) He goes on to admit, however, that he never "pursue[d] the issue with Nissan." (*Id.*) Needless to say, neither unsupported assertion can defeat summary judgment or undo what is explicitly contained in the Nissan contract: C&O was required to construct "Dealership Facilities so as to provide exclusive Nissan dealership facilities" and agreed to do so months before correspondence on the issue was exchanged with GM. (Ex. L. to Mot. for S.J.) The undisputed facts are these: As part of its agreement to with Nissan to allow it to become a Nissan dealer, C&O signed a contract wherein it specifically agreed to construct separate Nissan facilities at Nissan's request. Now, C&O seeks to impose the cost of this agreement on GM. This attempt should be rejected.

C&O's additional attempts to explain away its agreements with Nissan are similarly unavailing. C&O claims that the Court should disregard the fact that it had contracted with Nissan to provide separate facilities because the West Virginia Dealer Code somehow renders the Nissan separation provisions inoperable. (Opp. at 12.)[8] These arguments are wholly without merit. First and foremost, plaintiff does not cite to a single case that states that it is unlawful for a manufacturer to require separate dealer facilities in situations such as these. Nor can it. Indeed, the only authority relied upon by plaintiff states that a manufacturer *can* require separate facilities when such a requirement is based upon "reasonable business considerations." (Opp. at 13, citing W. Va. St. Ann. § 17A-6A-10.) Here, the reasonableness of the consideration cannot be disputed--C&O agreed to sign the written contract.

---

[8] Further to that point, plaintiff contends that §§ 17A-6A-5 and 6A-10 of the Dealer Code also make GM's separation requirements unlawful. (Opp. at 12.)

7

Courts throughout the country have found that it is common sense and generally reasonable for manufacturers not to want to operate under the same roof with their competitors. Indeed, these same courts have concluded that car dealers' failure to build separate facilities *justifies termination* of their respective dealer agreements.[9] *See, e.g., Maple Shade Motor Corp. v. Kia Motors of America, Inc.*, 384 F. Supp. 2d 770 (D.N.J. 2005) (dealer's failure to build a separate Kia showroom, after being notified that such a failure represented a material breach of the dealer agreement, justified the termination of its Kia franchise); *Autohaus, Inc. v. BMW of North Am., Inc.*, No. Civ. A. 92-10403-MA, 1993 WL 1503945 (D. Mass. Dec. 23, 1993) (BMW had good cause to terminate the franchise because dealer failed to relocate its BMW operations to a separate facility); *Scuncio Motors, Inc. v. Subaru, Inc.*, 555 F. Supp. 1121, 1136-37 (D.R.I. 1982) (franchisor is legally entitled to terminate a dealership when dealer fails to abide by the relocation provisions of dealer agreement); *Dunne Leases Cars & Trucks, Inc. v. Kenworth Truck Co.*, 466 A.2d 1153 (R.I. 1983) (failure to establish separate facility for truck-tractor dealership was a material breach of contract justifying termination of franchise). More importantly, though, whether the Nissan agreements are trumped by the West Virginia Code is of no moment. The undisputed fact is that C&O agreed (with Nissan) to separate facilities long before any alleged threatening conduct from GM. Simply put, there is no basis for C&O to claim that it was forced to "accede to [GM] demands" when it had already "accede[d]" to those of Nissan. (Opp. at 11.)

---

[9] It is critical to note that GM did not terminate plaintiff's Chevrolet dealership. Indeed, in response to plaintiff's placement of Nissan, GM agreed to C&O's request that it be given two years to effect a separation. Thus, GM allowed plaintiff to cure its breach by executing the April 17, 2002 Westhoff Letter. (Ex J to Mot. to S.J.) In short, GM did exactly what C&O requested of it--allowing C&O two years to separate its Nissan facilities from its Chevrolet operations.

Finally, C&O makes a great deal out of the fact that it "has subsequently discovered" that GM has allowed other West Virginia dealers to share facilities with non-GM line-makes. (Opp. at 13.) Notwithstanding the extremely scant record evidence of this assertion (indeed, the only specific cite provided by plaintiff is one sentence in Mr. Walker's conclusory affidavit), the fact that there may have been GM dealers that shared facilities with other manufacturers does not matter. First, as established during the deposition of Mr. Westhoff, at the time C&O acquired its Nissan dealership, GM's policy strongly disfavored the sharing of facilities. (*See* Ex. B to Opp. to S.J., Westhoff Dep. 105:7-16.) Moreover, the fact that other dealers may have different arrangements with GM is not a violation of any statute or contractual provision and does not negate the clear fact that plaintiff has acknowledged that GM was within its rights to request a separation in its particular location. (*See* Ex. F to Mot. for S.J., Walker Dep. 127:2-24.)

Plaintiff cannot advance a claim against GM to recover costs associated with the relocation of its Nissan dealership. Accordingly, Counts I, II, and III of its complaint should be dismissed with prejudice.

IV. **PLAINTIFF STILL CANNOT RECOVER DAMAGES HERE.**

In concluding the damages portion of its brief, plaintiff makes a statement on which both parties can agree: "Well, C&O's claims are *not* the types of claims that GM is used to seeing with respect to the Oldsmobile phase-out." (Opp. at 22.) Quite true. GM, however, would not stop there. The fact is that the law disallows recovery of "damages" where, as here, a plaintiff has suffered no injury in fact.

Plaintiff does not dispute that it is in a dramatically better position today than if GM's alleged wrongful conduct not occurred. Further, given the fact that plaintiff's "replacement" Nissan dealership has been hugely successful (*i.e.*, is now worth more than

9

four times what C&O originally paid for it), it fails to articulate how, at the end of the day, GM has caused it compensable damages. That is because there is no injury in fact or monetary loss. Tellingly, C&O is unable to cite a ***single*** legal authority in support of its claim for "mitigation damages" under these circumstances. Instead, C&O merely claims that *Jackson v. Volvo Trucks No. Amer., Inc.*, is inapposite. 2006 WL 2441434 (10th Cir. Aug. 24, 2006). However, C&O conspicuously fails to address the key holding in *Jackson*: "[plaintiff] has failed to demonstrate a genuine issue of material fact with regard to his alleged loss." 2006 WL 2441434, at * 7-8. In *Jackson*, the court ruled there were no damages to plaintiff because the stock that plaintiff bought (allegedly as a result of Volvo's conduct) was later sold by plaintiff for a profit. *Id.* Similarly, C&O has no legally cognizable "loss" based on the $1 million purchase of a Nissan franchise in 2001 (allegedly made as a result of GM conduct in discontinuing Oldsmobile), when that franchise--based on Mr. Love's testimony-- is now worth five times the purchase price.

Perhaps aware of the lack of legal support for its arguments, plaintiff resorts to the proverbial "hornbook law" argument. (Opp. at 20.) It is important to note that plaintiff does not ***actually cite*** to a single "hornbook" or legal treatise that recognizes its damages theory. Indeed, contrary to C&O's hornbook arguments, legal commentators largely agree that where (as here) a party has recouped or exceeded the value of its loss, it has been made whole. *See, e.g.*, WILLISTON ON CONTRACTS, Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts, § 64:27, 196 (4th ed. 2002).[10]

---

[10] Put another way, if the Nissan dealership was now worth less than the $1 million plaintiff paid to acquire it, C&O might have a compensable loss, if it could establish that GM committed a wrong that required it to make that acquisition. But it is undisputed that is not the case here; the Nissan dealership is now worth far more.

The policy behind this, of course, makes sense and has been echoed in other contexts. For example, in commercial sales, where a party seeks to recover damages based on a failure to deliver goods, its damages are limited if it has secured similar goods on the market and has suffered no economic loss. *See, e.g.*, THE RESTATEMENT (SECOND) OF CONTRACTS: Availability of Damages, Substitute Transactions, § 350(c) (1981). Similarly, in tort actions, courts generally apply the "benefits rule." If the alleged tortious conduct confers a benefit to plaintiff or its property, the value of that benefit is offset against any loss. *See, e.g.*, 22 Am. Jur. 2d Damages § 384 (2002). When a plaintiff is left with no loss, he is (as a logical matter) not allowed to recover damages. *Id.* Likewise, when courts fashion equitable remedies, it is black-letter law that "equity abhors the unjust enrichment that comes from a double satisfaction." *Henderson v. Webern*, 35 A.2d 609, 611 (N. J. 1944); *Pacwest, Ltd. v. R.T.C.*, No. 94 CIV. 2498, 1996 WL 325647 at *5 (S.D.N.Y. June 11, 1996) ("equity . . . abhors a windfall"). Whatever the context, the conclusion is clear: A party cannot recover damages where (like C&O) it has suffered no harm or injury in fact.

Furthermore, C&O cannot credibly deny that it agreed to bear the costs of the separation of its Nissan facilities. C&O does not dispute that it signed the letter agreement sent to it by Michael Westhoff. (Ex. J to Mot. for S.J.) Nor does it dispute that the letter it signed contained a clause by which C&O agreed pay for the costs of the Nissan relocation. (*Id.*) Critically, although C&O made changes to the GM letter, it never excised the separation clause. (*Id.*) Instead, C&O claims that the letter agreement is inoperative on technical grounds—because GM never sent written notification that it accepted C&O's modifications. This argument does not fly.

First, as made clear in the deposition of Michael Westhoff, GM communicated acceptance of C&O's changes directly to the dealership. (*See* Ex. B. to Opp. to S.J., Westhoff Dep. at 76-78.) As a matter of law, GM's conduct (communicating acceptance of C&O's changes and filing the signed agreement with its contracts department) is sufficient to establish that the agreement is enforceable. Even if Mr. Westhoff did not communicate GM's acceptance of C&O's "counteroffer" — as he testified he did — a contract between C&O and GM was still struck as a matter of law: "'That an acceptance' may be effected by silence accompanied by an act of the offeree which constitutes a performance of that requested by the offeror is well established." *Pertee v. Goodyear Tire & Rubber Co.*, 861 F.Supp. 523, 526 (S.D. W.Va. 1994) (omitting cites); *First Nat. Bank of Gallipolis v. Marietta Manufacturing Co.*, 151 W.Va. 636, 641-42 (W. Va. 1967).

Here, GM accepted C&O's "counteroffer" of the letter agreement, and the terms reflected therein, by allowing, as C&O has specifically requested, C&O two years to cure the breach of the Dealer Agreement (*i.e.*, separating C&O's Nissan and GM facilities and operations). Indeed, "'[w]here the offeree exercises dominion over things which are offered to him, such exercise of dominion in the absence of other circumstances stances showing a contrary intention is an acceptance.'" *Gallipolis*, 151 W. Va. at 642 (also noting that acceptance need not be actual, it may be inferred from the acts and conduct of the offeree).

Second, and perhaps more importantly, plaintiff's arguments about the enforceability of the April 17, 2002 letter agreement are too clever by half. On the one hand, plaintiff wishes the Court to believe that the letter agreement it extensively edited

and signed amounts to a "strong arm [to force] C&O into separating its facilities." (Opp. at 23.) On the other hand, to suit an alternative purpose, plaintiff argues that GM's "strong arm" contract is nothing more than an illusory and unenforceable counteroffer. Plaintiff cannot have it both ways. The facts are clear. Plaintiff signed a document by which it agreed to pay the costs of the Nissan separation and that document was accepted by GM. Plaintiff must accept the terms of the contract it negotiated, edited, and signed and bear the costs of the Nissan separation.

Finally, even assuming that plaintiff has suffered some loss, it cannot recover the damages it seeks in this case. The West Virginia Dealer Statute has enumerated the types of damages available to a dealer upon the non-renewal of a brand. WV. St. Ann. § 17A-6A-8.[11] In the non-renewal context, items such as "[s]upplies and parts inventory purchased from the manufacturer or distributor and listed in the manufacturer's or distributor's current parts catalog" and "[e]quipment, furnishings and signs purchased from the manufacturer or distributor" are recoverable. *Id.* However, the statute ***does not allow*** for the recovery of the purchase costs of an entirely new dealership. This makes sense. Indeed, as plaintiff admits, its claim concerning GM's breach of the dealer agreement is limited to a time span of one year. (Opp. at 4, "the flow of new cars available for sale would end in calendar year 2004.") However, the Nissan "replacement" provides a continuous stream of vehicles to sell. By claiming that it is entitled to the "replacement" value, C&O is pretending that its operative damages are a continuing supply of Oldsmobiles, not one year's worth. Neither the Dealer Statute (nor

---

[11] It is important to note that WV. St. Ann. § 17A-6A-8 was amended in 2006. Those recent amendments do not cover this case.

common sense) allows for such a method compensation.[12] At bottom, plaintiff suffered no damages. However, even if it could identify some monetary injury, the damages it seeks in this case are not allowed by law.

## CONCLUSION

In light of the foregoing arguments (and those set forth in its previous motion for summary judgment and memorandum in support), defendant General Motors Corporation respectfully requests that the Court grant it summary judgment. To this end, GM requests oral argument if it would be helpful to the Court.

Dated: October 26, 2006

Respectfully submitted,

*(signature)*

John H. Tinney (WVSB #3766)
John H. Tinney, Jr. (WVSB #6970)
The Tinney Law Firm, PLLC
707 Virginia Street, East
Chase Tower, 14th Floor
Charleston, WV 25301
(304) 720-3310

and

Mark S. Lillie
Joseph Russell
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

*Attorneys for Defendant*
*General Motors Corporation*

---

[12] At the time of the phase-out announcement, GM recognized (and continues to do so) that there are transition expenses associated with the non-renewal of a line-make of vehicles. To that end (and consistent with the West Virginia statute), GM developed a transition financial assistance program, called TFAP, to aid its Oldsmobile dealers to defray parts, facilities, essential tools and other transition expenses. (*See* Ex. C. to Mot. for S.J.; Mem. in Support of S.J. at 4.) C&O was one of only a handful of dealers, out of over 2800 nationwide, who refused to enter into discussions about the TFAP program (Mem. in Support of S.J. at 4.) For C&O, the TFAP would have generated nearly $400,000 in assistance. Although C&O has thus far spurned its efforts, GM remains willing to allow C&O to participate in the program.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

C&O MOTORS, INC.,
a West Virginia corporation,

Plaintiff,

v.

CASE NO. 2:2005-CV-00835

GENERAL MOTORS CORPORATION,
a Delaware corporation,

Defendant.

## AFFIDAVIT

Paul Eugene Walker, being first duly sworn on oath, deposes and says:

1. That your affiant is the General Manager of Plaintiff, C & O Motors, Inc. ("C&O"), and he makes this affidavit on behalf of C&O, being duly authorized to do so.

2. That your affiant negotiated the blue sky purchase of the rights to the Nissan franchise with Mr. Lester Raines. That my understanding was that Mr. Raines had been selling roughly the same number of Nissans on a monthly basis as C&O had been selling Oldsmobiles.

3. That your affiant initially proposed to just move Nissan into the Oldsmobile show room and on the adjacent Oldsmobile Chevrolet lot, and to do Nissan service in the existing Oldsmobile/Chevrolet service department. GM's reaction to this caused me to fear that we would also lose the Chevrolet franchise if I persisted in my desire to share facilities and personnel.

EXHIBIT A

4. That Mr. Love's/C&O's counteroffer, the marked up and initialed version of the Westhoff April 17th letter, was never initialed and signed and returned by GM. I asked Mr. Westhoff about where we stood concerning the letter numerous times. I never got a response one way or the other from him or anyone else at GM.

5. That we would not have incurred the additional facilities expenses but for the fact that GM insisted we, in effect, build a separate sales and service facility for Nissan. If I had my way, Nissan would be in the former Oldsmobile showroom, and the Nissan service and parts would be in the former Oldsmobile service and parts facility, which it shared with Chevrolet.

6. That GM stopped building 2004 Oldsmobiles in April of 2004. GM built no 2005 or 2006 models for us to sell before our Oldsmobile dealer agreement expired on October 31, 2005.

7. That we aggressively pursued the purchase of other dealers' Oldsmobile inventories after they discontinued business. As is demonstrated by our sales in 2001, we actually had one of our better years in that year simply because dealers who were discontinuing their operations were returning saleable current models.

8. That Nissan was thoroughly fed up Mr. Mr. Raines and had approached C&O to open a Nissan dealership in the Hurricane area—something we were not willing to do. Mr. Raines is a friend of mine and I knew from discussions with him that he was probably ready to be rid of Nissan.

2

9. That when we were told that Oldsmobile was going to disappear and that nothing would be manufactured after the 2004 models, we decided to try to mitigate the losses we were sure to experience by acquiring another franchise to replace Oldsmobile. Luckily, I was able to reach an agreement with Mr. Raines.

10. That Nissan wanted C&O to be one of its dealers. Indeed, they had been courting us. In my opinion, Nissan would have allowed us to share facilities with GM. However, because of GM's threats of termination of our Chevrolet franchise and Oldsmobile franchise, I did not pursue the issue with Nissan.

11. That I have subsequently learned, as I discussed in my deposition, that a number of GM dealers were sharing facilities with non-GM products at the same time GM was threatening to terminate our dealership agreement because we had contracted with Nissan and proposed to share service and sales resources.

12. That both Mr. Love and I are generally familiar with the provisions of the West Virginia Code that allow termination of dealer agreements on one year's notice if a car line is eliminated. Based on our performance, we would ordinarily have expected our agreement to be renewed. Of course, the Oldsmobile portion of the dealer agreement was not renewed on expiration. We were not happy about this but have not sued over it. Our complaints pertain to GM's actions while the dealer agreement was still in place—breaches during its term and violations of the West Virginia Code before expiration.

13. That the price I negotiated for the Nissan blue sky rights was very favorable. I believe we bought these rights at under market value. C&O could have resold these rights for more than we paid within a week after we reached our agreement with Mr. Raines to the Moses family companies.

Dated at Charleston, West Virginia, this 16th day of October, 2006.

_____
Paul Eugene Walker

## VERIFICATION

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA, To-wit:

Paul Eugene Walker, the affiant named in foregoing Affidavit, having been first duly sworn on oath, deposes and says that the facts and allegations contained therein are true, except insofar as they are stated to be on information, and so far as they are therein stated to be on information, he believes them to be true.

_____
Paul Eugene Walker

Taken, subscribed and sworn to before me this 16th day of October, 2006.

My commission expires: 6-11-2011

_____
Notary Public



OFFICIAL SEAL
JOAN P. BARTLETT
NOTARY PUBLIC
STATE OF WEST VIRGINIA
202 Fifth Street
St. Albans, WV 25177
My Commission Expires 04-11-2011

4

IN THE UNITED STATES DISRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

at Charleston

C&O MOTORS, INC.,
a West Virginia corporation,

      Plaintiff,

v.                                               Case No. 2: 05cv0835

GENERAL MOTORS CORPORAITON,
a Delaware corporation,

      Defendant.

### CERTIFICATE OF SERVICE

I, John H. Tinney, Jr., counsel for Defendant, hereby certify that on the 26th day of October, 2006, the foregoing **"General Motors Corporation's Reply in Further Support of its Motion for Summary Judgment"** was served upon plaintiff by hand-delivery as follows:

      Mark A. Swartz, Esquire
      Swartz & Stump, L.C.
      803 Quarrier Street
      Suite 500
      P. O. Box 673
      Charleston, WV  25323-0673
      *Counsel for Plaintiff*

/s/ John H. Tinney, Jr.
John H. Tinney, Jr. (WV State Bar #6970)