UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

C & O MOTORS INC.,
a West Virginia Corporation,

    **Plaintiff**

v.                            CIVIL ACTION NO. 2:05-835

GENERAL MOTORS CORPORATION,
a Deleware Corporation,

    **Defendant**


<u>MEMORANDUM OPINION AND ORDER</u>


Pending before the court are defendant's motions, filed October 18, 2005, and October 2, 2006, seeking dismissal of this action and summary judgment on plaintiff's claims.[1]


I.


This case arises out of the decision of defendant, General Motors Corporation ("GM"), to terminate production of its Oldsmobile line of automobiles.  Plaintiff C&O Motors, Inc. ("C&O") had been a dealer of GM's Oldsmobile line of vehicles for over 60 years.  (Pl.'s Resp. Memo. at 2.)  C&O also sold and

---

[1] Under the parties' joint stipulation, GM voluntarily withdrew its motion to dismiss with "the exception that it continues to argue that C&O's statutory claims are time-barred by W. Va. Code § 17A-6A-7(e)."

1

continues to sell GM's Chevrolet line of vehicles in addition to a number of other manufacturers' vehicles.  (Id.)

On or about November 1, 2000, the parties executed a Dealer Sales and Service Agreement ("Dealer Agreement"), which expressly defined their manufacturer-dealer relationship. (Id., Def.'s Memo. at 3.)   The Dealer Agreement was effective from November 1, 2000, to October 31, 2005, and permitted C&O to sell vehicles manufactured by both the Chevrolet and Oldsmobile division of GM.  (Dealer Agreement, attached as Ex. A to Def.'s Memo.)

On December 12, 2000, approximately six weeks after the parties executed the Dealer Agreement, GM notified all Oldsmobile dealers that it would "phase out" the "Oldsmobile Division and its products over the next several years."  (Notification Letter, attached as Ex. B to Def.'s Memo.)  The notice explained that "Oldsmobile has continued to lose market share and is still not profitable," but further provided that "GM plans to continue to produce and sell current Oldsmobile products until the end of their current model life cycles, or earlier if market demand falls below economic levels."  (Id.)

On December 14, 2000, GM notified its dealers of its

2

Transitional Financial Assistance Program ("TFAP").  This notice
states, in excerpted form, that

> We wish to again emphasize that the Oldsmobile
> announcement is not a termination of the Dealer
> Agreement with any Oldsmobile dealer.
>
> As the transition of Oldsmobile goes forward, it
> will be up to each individual Dealer Operator to make
> business decisions that are right for that
> dealership's circumstances.  To assist you in that
> process, we are providing information on transition
> assistance now so you can begin your business
> transition planning.
>
> The transition assistance package is designed to
> assist Oldsmobile dealers in phasing out their
> Oldsmobile dealership operations. It also goes beyond
> GM's contractual obligations under the Dealer
> Agreement and applicable state laws.
>
> Transition assistance available to all Oldsmobile
> dealers includes provisions for the repurchase of new
> and unused vehicle inventory, signs, essential tools,
> and parts and accessories.
>
> In addition, a supplemental transition assistance
> payment will be available to each dealer.  This
> supplemental payment amount will take into account the
> individual circumstances of each dealer (e.g.,
> facilities, leasehold improvements, yearly sales, and
> special agreements with GM).

(TFAP Notice, attached as Ex. C to Pl.'s Memo.)[2]

---

[2]To date, C&O has elected not to participate in the TFAP.
GM represents, and C&O does not dispute, that of the
approximately 2,800 former Oldsmobile dealers nationwide only
eight dealers, including C&O, have not elected to participate in
the TFAP.  GM further represents that had C&O accepted the TFAP
it would have been entitled to receive nearly $400,000.  GM
remains willing to resolve this case for that amount.

In December of 2001, C&O purchased a Nissan vehicle
dealership from Lester Raines for $1,000,000.  (Pl.'s Memo. at 4.)
Under the terms of C&O's agreement with Nissan, C&O was "to
provide exclusive Nissan dealership facilities . . ."  (Nissan
Dealer Agreement, attached as Ex. K to Def's Memo.)  This
agreement further provided that C&O "shall complete construction
of the New [Nissan] Dealership Facilities and have them fully
operational on or before September 6, 2004."  (Id.)

By letter dated December 17, 2001, C&O's General
Manager, Paul E. Walker, informed GM's Market Area Manager,
Michael J. Westhoff, that C&O had applied for a Sales and Service
Agreement from Nissan, and that the GM and Nissan sales
departments would be in the same building initially but would be
totally separated after a period of two years.  (Walker Letter,
attached as Ex. I to Def.'s Memo.)  It appears that C&O
subsequently began selling Nissan vehicles sometime in 2002.

On April 17, 2002, Westhoff responded by sending C&O's
principal, James F. Love III, a proposed letter agreement for his
execution.  In the letter agreement, GM proposed that C&O could
complete the separation of the GM and Nissan facilities by

4

December 17, 2003.[3]  (Letter Agreement, attached as Ex. J to
Def.'s Memo.)  More specifically, the letter agreement provides,
among other things, that (1) the addition of the Nissan dealership
to the GM facility without the prior written approval of GM is a
material breach of the Dealer Agreement; (2) C&O agrees that the
costs and expenses incurred to effectuate the separation of the
Nissan dealership are to be paid by C&O; (3) the letter agreement
is made and executed under C&O's own free will and C&O was not
influenced, coerced or induced to enter into the agreement by any
representations or promises of GM not set forth in the letter
agreement; and (4) the letter agreement can be enforced by
equitable relief with C&O bearing the obligation to pay GM's
attorney's fees if GM prevails in enforcing the letter agreement.
(Id.)

On June 6, 2002, Love struck and initialed certain
portions of the letter agreement, executed the document and
returned it to GM.  (Id.)  Among the provisions Love struck were
(1) the recitation that C&O's addition of the Nissan dealership to

---

[3]The Dealer Agreement provided that C&O would give GM
written notice of a proposed change in its facilities.  The
Dealer Agreement further provided that "[n]o change in location
or in the use of Premises, including addition of any other
vehicle lines, will be made without General Motors prior written
authorization pursuant to its business judgment."

the GM facility without GM's approval is a material breach of the
Dealer Agreement and (2) the provision that provided that GM may
enforce the letter agreement by equitable relief and C&O will pay
GM's attorney's fees should GM prevail in an action to enforce the
letter agreement.  According to the stamp on the letter agreement,
it was received by GM's "Dealer Contractual Group" on June 10,
2002.[4]  (Id.)

———————————————

[4] The parties dispute whether the letter agreement
constitutes a contract.  C&O states that the letter agreement is
merely an unaccepted counter-offer, while GM argues that the
letter agreement is a valid contract.

   The purported agreement is not governed by the provisions
of the Uniform Commercial Code, so the court applies West
Virginia common law, which provides that where a purported
acceptance of an offer modified the terms of the offer, it is a
rejection of the original offer and has the legal effect of a
counter-offer, which may then be accepted.  United States v.
Marietta Mfg. Co., 339 F. Supp. 18, 27-28 (S.D. W. Va.
1972)(citing Hancock v. Fletcher, 169 S.E. 457 (W. Va. 1933)).
In the record before the court there is evidence of GM's
acceptance of Love's counter-offer as Westhoff testified that he
verbally communicated GM's acceptance of C&O's changes to Walker.
(Westhoff Depo. at 76-78, attached as Ex. B to Pl.'s Resp. Memo.)

   Alternatively, it is has been recognized that an offeree's
acceptance may be inferred from the acts and conduct of the
offeree, including his silence.  First National Bank of
Gallipolis v. Marietta Manufacturing Co., 153 S.E. 2d 172, 176-77
(W. Va. 1967).  Even if GM was silent with respect to the
counter-offer, as C&O appears to posit, the court can infer GM's
acceptance of the terms of the counteroffer inasmuch as GM
subsequently did not terminate C&O's Chevrolet dealership and
permitted C&O to have two years in which to separate the Nissan
and Chevrolet facilities.

C&O subsequently acquired and renovated new and existing property and separated the Nissan dealership.[5]  (Compl. at ¶ 14.) GM stopped manufacturing Oldsmobiles in April of 2004.  (Prop. Prtrl. Ord. at 11.)  According to Love, GM stopped providing C&O with Oldsmobiles in August of 2004.  (Love Depo. at 169-70.)  On October 27, 2004, GM sent C&O a letter advising C&O of its intent not to renew the Oldsmobile Dealer Agreement currently in effect upon its expiration on October 31, 2005.[6]  (Notification Letter, attached as Ex. O to Def.'s Memo.)  The Dealer Agreement between GM and C&O was subsequently renewed with respect to the Chevrolet line of vehicles.

C&O instituted this action in the Circuit Court of Kanawha County on September 14, 2005.  On October 18, 2005, GM removed the case on diversity grounds and C&O subsequently moved to remand the action.  By way of order entered September 8, 2006, the court denied C&O's motion to remand.

_____

[5] GM represents that Nissan paid C&O $120,000 to provide exclusive Nissan facilities.  C&O has not denied this representation.

[6] This notice was required under West Virginia Code Section 17A-6A-7(d), which provides that twelve month's notice is necessary when "a manufacturer or distributor discontinues production of the new motor vehicle dealer's product line or discontinues distribution of the product line in this state." C&O has stipulated that it received timely notice in accordance with this statute.

7

According to the allegations in the complaint, after announcing its decision to terminate the Oldsmobile line of vehicles, C&O asserts that GM engaged in the following misconduct: (1) misrepresenting GM's "buy-out" program, which was offered to C&O as superior to GM's contractual obligations and C&O's state law remedies; (2) refusing to allow C&O to use its existing sales and service facilities and personnel for use in its newly acquired Nissan dealership; (3) threatening to terminate the remaining Chevrolet line if C&O did not completely separate the Nissan dealership; and (4) giving new Saab and Hummer dealerships to a competing dealer, in which GM maintains a majority interest, instead of first offering these dealerships to C&O and other GM dealers in the Charleston area.[7]   (Id. ¶¶ 13, 15-16, 19.)

C&O's three count complaint contends (1) GM's conduct violated numerous provisions of the West Virginia Code relating to the conduct of vehicle manufacturers; (2) GM's conduct was an anticipatory breach of numerous provisions of the Dealer Agreement; and (3) GM actually breached numerous provisions of the

---

[7] From C&O's representations it is unclear how GM's purported conduct in giving Saab and Hummer dealership to another dealer, in which GM maintained a majority interest, is relevant to any of C&O's legal theories.  The complaint appears to be the only place in which this fact is referenced.

Dealer Agreement.[8]  C&O demands actual damages in the amount of $1,650,000, statutory treble damages of not less than $4,950,000, prejudgment interest, and attorney fees and costs.

## II.

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party,

---

[8] The parties provide no discussion of C&O's claim that GM's conduct amounts to an anticipatory breach of the Dealer Agreement.  The fact that it is not mentioned in plaintiff's version of the proposed pretrial order suggests that this claim may have been abandoned.  In any event, the West Virginia Supreme Court of Appeals has recognized that an "[a]nticipatory breach of a contract is one committed before the time has come when there is a present duty of performance."  Annon v. Lucas, 185 S.E.2d 343, 350 (W. Va. 1971).  Inasmuch as the Dealer Agreement has expired and GM has allegedly failed to perform in accordance with the Dealer Agreement, C&O has a cause of action for an actual breach of the Dealer Agreement and its claim alleging an anticipatory breach of the Dealer Agreement can be dismissed as moot.

9

a reasonable fact-finder could return a verdict for the non-movant.  Id.  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); Id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-moving party.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Regarding contract cases specifically, our court of appeals has observed the matter of "interpretation is a subject particularly suited for summary judgment . . . ."  Bank of Montreal v. Signet Bank, 193 F.3d 818, 835 (4th Cir. 1999).  It has also been observed repeatedly, however, that "[a]n ambiguous contract that cannot be resolved by credible, unambiguous, extrinsic evidence discloses genuine issues of material fact . . . [and] summary judgment is inappropriate."  Sempione v. Provident Bank, 75 F.3d 951, 959 (4th Cir. 1996).  Expanding upon this analysis, the court of appeals has observed:

10

A court faces a conceptually difficult task in deciding
whether to grant summary judgment on a matter of
contract interpretation. Only an unambiguous writing
justifies summary judgment without resort to extrinsic
evidence, and no writing is unambiguous if "susceptible
to two reasonable interpretations." <u>American Fidelity &
Casualty Co. v. London & Edinburgh Ins. Co.</u>, 354 F.2d
214, 216 (1965). The first step for a court asked to
grant summary judgment based on a contract's
interpretation is, therefore, to determine whether, as a
matter of law, the contract is ambiguous or unambiguous
on its face. If a court properly determines that the
contract is unambiguous on the dispositive issue, it may
then properly interpret the contract as a matter of law
and grant summary judgment because no interpretive facts
are in genuine issue. Even where a court, however,
determines as a matter of law that the contract is
ambiguous, it may yet examine evidence extrinsic to the
contract that is included in the summary judgment
materials, and, if the evidence is, as a matter of law,
dispositive of the interpretative issue, grant summary
judgment on that basis. <u>See Jaftex Corp. v. Aetna
Casualty and Surety Co.</u>, 617 F.2d 1062, 1063 (4th
Cir.1980). If, however, resort to extrinsic evidence in
the summary judgment materials leaves genuine issues of
fact respecting the contract's proper interpretation,
summary judgment must of course be refused and
interpretation left to the trier of fact. <u>World-Wide
Rights Ltd. Partnership v. Combe Inc.</u>, 955 F.2d 242, 245
(4th Cir.1992).

<u>Goodman v. Resolution Trust Corp.</u>, 7 F.3d 1123, 1126 (4th Cir.

1993).


III.


A.      <u>C&O's Breach of Contract Claims</u>


        Identifying the precise allegations relating to C&O's

breach of contract claim has proven elusive.  In its complaint C&O

alleges

GM has breached its obligation which 'assures [C&O] an opportunity to enter a new Agreement(s) at the expiration date if General Motors determines that Dealer has fulfilled its obligation under this Agreement(s).'

Since GM's announcement of the termination of Oldsmobile, C&O has not been offered any replacement line-make, model type or model series from GM to substitute for the loss of the Oldsmobile brand.

C&O had to go out and find its own replacement dealership to mitigate against the losses sustained and/or anticipated as a result of GM's termination of the Oldsmobile brand.

After August of 2004, GM has failed to provide any new Oldsmobile cars to C&O for sale to the public.

GM has breached its obligation to 'permit each dealer the opportunity to achieve a reasonable return on investment if it fulfills its obligations under its Dealer Agreement.'

GM has denied C&O the opportunity to achieve a reasonable return on its investment in the Oldsmobile and the C&O goodwill associated therewith.

GM dealers, which were not Oldsmobile dealers, to whom GM has assigned the right to sell GM line-makes after 2000 in C&O's relevant market area have benefitted as GM eliminates the competition of its GM Dealers assigned the Oldsmobile brand while the GM Oldsmobile dealers have only been penalized by the loss of their dealerships.

GM is required to act in good faith, observe commercial standards of fair dealing and act honestly. Discrimination towards a particular dealer or dealer group is not fair dealing.  GM retains the ability and is obliged to adjust its network of sales, brands and dealers to accommodate the economic injuries visited on its dealers by its December 12, 2000, decision to

12

eliminate the Oldsmobile brand.
(Compl. at ¶¶ 35-42.)  While language of the Dealer Agreement is
cited in the complaint, no contractual provisions are specifically
identified.

In its response to GM's motion for summary judgment, C&O
identifies a number of provisions in the Dealer Agreement which it
maintains are relevant.  Included in those provisions are Articles
4.1, 6.1, and 6.4.1.  Minimal discussion is provided as to how
these provision apply.

After C&O filed its response brief, the parties entered
into a joint stipulation which narrows C&O's claims.  The joint
stipulation indicates that C&O is not claiming that GM violated
either the West Virginia Code or the terms of the Dealer Agreement
when it did not renew the Dealer Agreement upon its expiration.
(Jt. Stip. at ¶¶ 5, 6.)  With respect to C&O's breach of contract
claim the joint stipulation provides

> The Plaintiff does claim herein that GM's conduct
> during the term of the Dealer Agreement was in breach
> of said contract including a failure to supply it with
> new cars for sale after GM stopped producing
> Oldsmobiles, a failure to act in a commercially
> reasonable way, in good faith and deal fairly with the
> Plaintiff with regard to its acquisition of the Nissan
> dealership, the location of Nissan dealership
> operations and the use of the facilities approved by GM
> for Oldsmobile and Chevrolet dealership operations.

13

1.  <u>Claims based on GM's Failure to Renew the Dealer
    Agreement</u>

In light of the parties' stipulation and evidence of
record, to the extent that C&O is asserting that GM breached the
Dealer Agreement when it failed to renew the Dealer Agreement with
respect to the Oldsmobile line of vehicles, the court finds that
this claim should be dismissed.[9]

2.  <u>Article 4.1</u>

The only provision discussed by C&O in support of its
breach of contract claim is Article 4.1 of the Dealer Agreement.
This provision provides in relevant part,

> Because GM distributes its Products through a network
> of authorized dealers operating from approved
> locations, those dealers must be appropriate in
> number, located properly, and have proper facilities
> to represent and service GM products competitively
> and <u>to permit each dealer the opportunity to achieve
> a reasonable return on investment if it fulfills its
> obligations under its Dealer Agreement</u>.  Through such
> a dealer network, General Motors can maximize the
> convenience of customers in purchasing products and
> having them serviced.  As a result, customers,
> dealers, and General Motors all benefit.

_____

[9] In addition to the joint stipulation, Love testified that
"GM had a right to pull the plug on the line of cars and they did
it."  (Love Depo. at 171, attached as Ex. D to Pl.'s Memo.)
Walker has also acknowledged that "[w]e were not happy about [the
Dealer Agreement not being renewed] but have not sued over it."
(Walker Aff. at ¶ 12, attached as Ex. 1 to Pl.'s Memo.)

14

(emphasis supplied).  C&O asserts that this provision creates an affirmative duty on GM to permit it an opportunity to achieve a reasonable return on its investment.

The court first observes that the title of Article 4 is "Authorized Locations" and the heading before Article 4.1 reads "Dealer Network Planning."  While Article 4.1 could give rise to a cause of action for an alleged failure by GM to properly establish the number and location of dealerships so that C&O enjoys the opportunity to achieve a reasonable return on its investment, C&O has not presented a factual basis supporting any such failure by GM.  Nor has C&O shown action on GM's part that was designed to preclude C&O from possessing proper facilities with which to represent and service GM products so as to achieve such a reasonable return.  Instead, C&O is alleging a breach of the Dealer Agreement based on GM's failure to continue to deliver new Oldsmobiles through the agreement's expiration.  A reading of the plain language of Article 4.1 yields the conclusion that this provision was not intended to serve as a cause of action for a dealer asserting a claim for the failure to provide new Oldsmobiles through the expiration of the agreement.  Thus, C&O's claim that GM breached Article 4.1 does not survive summary judgment.

3.  <u>Articles 6.1 and 6.4.1</u>

Article 6.1 of the Dealer Agreement provides in
pertinent part that

> General Motors will periodically furnish Dealer
> one or more Motor Vehicle Addenda specifying the
> current model types or series of new Motor Vehicles
> which Dealer may purchase under this Agreement.
> General Motors may change a Motor Vehicle Addendum by
> furnishing a superseding one, or may cancel an
> Addendum at any time.
>
> General Motors will endeavor to distribute new
> Motor Vehicles among its dealers in a fair and
> equitable manner.  Many factors affect the
> availability and distribution of Motor Vehicles to
> dealers including component availability and available
> production capacity, sales potential in Dealer's Area
> of Primary Responsibility, varying consumer demand,
> weather and transportation conditions, governmental
> regulations, and other conditions beyond the control
> of General Motors.  General Motors reserves to itself
> discretion in accepting orders and distributing Motor
> Vehicles and its judgments and decisions are final.[10]

In addition to Article 6.1, Article 6.4.1 provides in
relevant part that

> Dealer agrees to purchase and stock and General
> Motors agrees to make available, subject to Article
> 6.1, a mix of models and series of Motor Vehicles
> identified in the Motor Vehicle Addendum in
> quantities adequate to enable Dealer to fulfill its

---

[10] The only Motor Vehicle Addendum before the court provides
that C&O has the "nonexclusive right to buy the following new
Motor Vehicles marketed by Oldsmobile Division of General Motors
Corporation, subject to the terms and conditions of the Standard
Provisions: [listing five Oldsmobile vehicle models]."

16

obligations in its Area of Primary Responsibility.

GM contends that it met its obligations under the Dealer Agreement inasmuch as (1) GM made special arrangements for Oldsmobile dealers to order "new" Oldsmobile vehicles from GM through GM's inventory website through 2005; (2) C&O had the opportunity to order Oldsmobiles from GM through 2005, (3) there is no evidence of record that GM ever failed to deliver an Oldsmobile ordered by C&O, and (4) C&O's claim for breach of the Dealer Agreement is without contractual support.  (Def's. Memo. at 11-13.)  GM further asserts that C&O cannot state a claim under the anti-discrimination language of Article 6.1 inasmuch as there is no evidence of an inequitable distribution of Oldsmobiles.

C&O responds asserting that in April of 2004, GM stopped producing new Oldsmobiles and failed to provide any new Oldsmobiles to C&O after August, 2004, and GM never produced any 2005 models.  Accordingly, C&O did not have the opportunity to purchase 2005 Oldsmobiles as was its purported right under the contract.  In support, C&O contends that, "[w]hether the alleged opportunity to order last years [sic] models from a GM website satisfies GM's obligations to provide its dealers with new cars for sale is, at best, a breach of the Dealer Agreement as a

matter of law and, at worst, a jury issue of disputed fact."

Although C&O cites no specific contractual language in support of this argument, it appears that C&O may maintain an action for breach of contract under Article 6.4.1. Under this provision, GM was obligated to make available a mix of models and series of Oldsmobile vehicles identified in the Motor Vehicle Addendum in quantities adequate to enable C&O to fulfill its obligations in its area of primary responsibility. The court is unable to conclude, as a matter of law, that GM's providing of a mix of dated 2004 models through the 2005 year satisfies its obligation under 6.4.1 to provide vehicles in "quantities adequate to enable C&O to fulfill its obligation in its area of primary responsibility." The court further observes that at least two federal district courts have permitted dealers to assert a claim for GM's alleged failure to make available Oldsmobile vehicles in quantities adequate to enable the dealer to fulfill its obligations. Bert Smith Oldsmobile v. General Motors Corp., CA No. 8:04-2666 (M.D. Fla. 2005); Andrews Oldsmobile Datsun, Inc. v. General Motors Corp., 8:02-1715 (M.D. Fla. 2003). Also, at least one state court has reached a similar conclusion when addressing GM's motion for summary judgment. Crippen Auto Mall, Inc. v. General Motors Corp., CA No. 02-1107-

CZ, at pgs. 9-10. (Cir. Ct. Mich. 2003)(GM was not entitled to summary judgment with respect to dealer's breach of contract claim under Article 6.4.1.)   Indeed, the facts presented appear to suggest that GM may have breached this provision.  Moreover, by GM's own admission, in 2005, the entire number of "new" Oldsmobiles sold by dealers nationwide was only 276.

        To the extent C&O is challenging the manner in which GM distributed Oldsmobiles or conducted the phase-out of Oldsmobiles under Article 6.1 such a claim fails.  As Walker testified, he was not aware of any evidence or facts indicating that C&O was treated differently than any other Oldsmobile dealer.  (Walker Depo. 147-48, attached as Ex. F to Def.'s Memo.)

    4.   Miscellaneous Breach of Contract of Claims

        C&O asserts that GM breached the contract when it required it to relocate and separate the Nissan showroom service and parts from the facilities which Oldsmobile sales, service and parts had utilized and then "threatened" to terminate C&O's Dealer Agreement with respect to the Chevrolet line.  (Prop. Prtrl. Ord at 3.)  C&O further alleges that GM breached the Dealer Agreement and failed to act in a commercially reasonable way, in good faith, and fairly with regard to C&O's (1)

acquisition of the Nissan dealership to replace the lost
Oldsmobile franchise; (2) desire to display Nissan vehicles where
it had previously displayed Oldsmobiles; (3) desire to service
Nissans where it had serviced Oldsmobiles; (4) desire to stock
and sell parts where it had stocked and sold Oldsmobile parts;
(5) desire to use the same employees who had sold new Oldsmobiles
and Chevrolets to sell new Nissans and Chevrolets; and (6) desire
to use the same employees who had sold and stocked parts and had
serviced Oldsmobiles to perform the same functions for Nissan.
In support of this claim, C&O has provided an affidavit from
Walker which states that GM has allowed other West Virginia
dealers to share in the same building the display and service
areas of other manufacturers with that of a GM line of vehicles.

C&O cites no contractual provisions or decisional law
in support of its argument that GM's alleged conduct amounts to a
breach of the Dealer Agreement.  Although C&O repeatedly insists
that GM's conduct in requiring the separation of the Nissan and
Chevrolet dealerships amounts to a breach of the Dealer
Agreement, the court has not found any provision supporting C&O's
assertion that GM's conduct was inconsistent with GM's rights and
obligations under the Dealer Agreement.  Indeed, Nissan also
insisted that its dealership be separated from the Chevrolet

dealership and C&O agreed.  A dealer's failure to build a
separate facility in violation of its agreement with the
manufacturer has been found to constitute good cause for
termination of the franchise.  Maple Shade Motor Corp. v. Kia
Motors of America, Inc., 384 F. Supp.2d 770, 779 (D. N.J. 2005);
see also Dunne Leases Cars & Trucks, Inc. v. Kenworth Truck Co.,
466 A.2d 1153 (R.I. 1983) (dealer's failure to establish separate
facility for truck-tractor dealership was a material breach of
contract justifying termination of the franchise).

It appears that the only evidence of GM's allegedly
"threatening" conduct is GM's letter agreement wherein it is
stated, "[a]s we discussed, the addition of Nissan without the
prior written approval of GM is a material breach of the C&O
Motors GM Dealer Sales and Service Agreement, and if not cured,
grounds for termination of the Dealer Agreement."[11]  Again, this
statement is entirely consistent with GM's rights under the
Dealer Agreement and, at his deposition, C&O's Walker conceded
that under the Dealer Agreement GM "has the right to insist . . .
[that] the Nissan facility is separate from the Chevrolet

---

[11] As the court observed in Section I, Love struck this
language from the letter agreement.

facility . . .”[12]   (Walker Dep. at 127, attached as Ex. F to
Def.'s Memo.)

        In view of the foregoing, C&O's claim that GM's conduct
in response to C&O's desire to acquire a Nissan dealership
constituted a breach of contract fails as a matter of law.

B.   C&O's Statutory Claims

        Ascertaining the precise statutory claims being
asserted by C&O has proven challenging.   C&O's complaint
maintains that C&O is asserting statutory claims under W. Va.
Code Section 17A-6A-4 and "W. Va. Code § 17A-6A-10, including
without limitation, (1)(d), (2)(a)."   In its briefing on the
summary judgment motions, C&O references claims under W. Va. Code

_____

        [12] In its response memorandum C&O first references Article
4.4.2 which provides that if C&O wants to make changes in
locations on the premises it will give GM written notice of the
propsed change for GM's "evaluation and final decision in light
of dealer network planning considerations."   The same article
further provides that if GM requires any changes in the premises,
it will consult with C&O, indicate the rationale for the change
and solicit C&O's view on the proposal.   According to C&O, GM did
not "(i) evaluate in light of dealer network planning
considerations; (ii) consult with dealer; (iii) indicate
rationale for change; and (iv) solicit dealer's views regarding
its position.   It is unclear as to what damages C&O could have
suffered as a result of this alleged breach.   C&O provides no
further discussion on this alleged breach and does not list it
among its breach of contract claims in the stipulation or
proposed pretrial order.   This claim thus appears to be abandoned
and should be dismissed.

Sections, 17A-6A-5(c), 17A-6A-10(1)(f) and (g), and 17A-6A-10(2)(g).  In the joint stipulation and proposed pretrial order, filed after the completion of the briefing, C&O lists ten statutory provisions that GM allegedly violated: W. Va. Code §§ 17A-6A-5(c), 17-6A-10(1),(d),(f),(g),(h), 17A-6A-10(2)(a),(g),(q), and 17A-6A-10(5).  C&O also asserts a statutory damages claim under W. Va. Code § 17A-6A-16(1) and (2).  GM has responded in its portion of the proposed pretrial order explaining why each of C&O's ten statutory claims fails.  Before addressing C&O's statutory claims, the court first turns to the question of whether these claims were timely asserted.

     1.   <u>Timeliness of C&O's Statutory Claims</u>

        The court first addresses GM's assertion that C&O's statutory claims are untimely.  West Virginia Code § 17A-6A-7(e) states that "any motor vehicle dealer who receives a notice of intent to discontinue, cancel or not renew a dealer agreement may, within a one hundred twenty-day notice period, file a petition or complaint for a determination of whether such action is an unfair or prohibited discontinuation, cancellation or renewal."

        GM contends that application of this statutory

23

provision operates to bar all of C&O's statutory claims inasmuch as they all arise out of the non-renewal of the Oldsmobile line. GM observes that it is undisputed that GM provided C&O with written notice of its intent to not renew the Oldsmobile agreement on October 27, 2004, and further notes that the 120-day period in which C&O may bring a claim challenging such non-renewal expired on February 24, 2005.  Inasmuch as C&O did not file its complaint until September 14, 2005, GM asserts that C&O's statutory claims are untimely.

GM's argument does not carry the day inasmuch as C&O has expressly stipulated that it is not asserting a statutory claim challenging GM's decision not to renew the Dealer Agreement.  The remaining statutory claims are not affected by the 120-day limitation.  Accordingly, the motion to dismiss, which GM agrees is confined to the timeliness of the filing of the statutory claims, is denied.

  2.  __W. Va. Code § 17A-6A-5(c)__

This section provides that

    Notwithstanding any agreement, the following alone
    shall not constitute good cause for the termination,
    cancellation, nonrenewal or discontinuance of a dealer
    agreement . . .

    (c) The fact that the new motor vehicle dealer owns,
    has an investment in, participates in the management

24

> of, or holds a dealer agreement for the sale of another
> make or line of new motor vehicles, or that the new
> motor vehicle dealer has established another make or
> line of new motor vehicles in the same dealership
> facilities as those of the manufacturer or distributor:
> Provided, [t]hat the new motor vehicle dealer . . .
> remains in substantial compliance with the terms and
> conditions of the dealer agreement and with any
> reasonable facilities' requirements of the manufacturer
> or distributor.

C&O cites this statute but fails to explain how it applies here.  The parties' stipulation states that C&O is not asserting a statutory claim based on GM's decision not to renew the Dealer Agreement.  It further appears that there can be no claim under this statute related to the Chevrolet line of vehicles inasmuch as C&O remains a Chevrolet dealer to this date.  The court thus finds that this statute is inapplicable in view of the parties' joint stipulation.

3.    <u>W. Va. Code §§ 17-6A-10(1),(d),(f),(g),(h)</u>

Under subsection (d) of this statute, GM could not require C&O to "[e]nter into any agreement with the manufacturer or distributor or do any other act prejudicial to the new motor vehicle dealer by threatening to terminate a dealer agreement." The subsection further provides that "[n]otice in good faith to any dealer of the dealer's violation of any terms or provisions of the dealer agreement is not a violation of this article."

25

C&O maintains that GM violated this subsection when it
attempted to extract an agreement from it by threatening to
terminate its Dealer Agreement with respect to the Chevrolet
line.  GM responds asserting that this provision does not apply
because C&O and GM's relationship was governed by a pre-existing
contract that required a separation of the GM and Nissan
facilities and there was also a pre-existing contract between C&O
and Nissan that required the same separation.  GM further asserts
that any notice by GM of C&O's breach of the Dealer Agreement was
made in good faith and supported by C&O's prior agreements with
GM and Nissan.

As the court has previously observed, the only evidence
of the alleged threatening conduct by GM is merely the letter
agreement in which GM correctly observed that C&O breached the
Dealer Agreement.  Love presumably was not threatened by this
language, as he struck the supposedly threatening provision which
provided that "the addition of Nissan with the prior written
approval of GM is a material breach of the C&O Motors GM Dealer
Sales and Service Agreement, and if not cured, grounds for
termination of the Dealer Agreement."  Furthermore, C&O's
contention that GM attempted to extract an agreement from C&O is
contradicted by the terms of the letter agreement, which Love

declined to excise.  That portion of the letter agreement specifically provides that the letter agreement was made and executed under C&O's own free will and C&O was not influenced, coerced or induced to enter into the agreement.  Finally, GM's argument that notice of C&O's breach of the Dealer Agreement was provided in good faith and in accordance with the parties' agreement is similarly well taken and C&O has not produced any evidence to suggest otherwise.  Accordingly, C&O's claim under this section fails as well.

Under subsection (f) of this statute GM could not require C&O to

> (f) Refrain from participation in the management of, investment in or the acquisition of any other line of new motor vehicle or related products, provided that the dealer maintains a reasonable line of credit for each make or line of vehicle, remains in compliance with reasonable facilities requirements and makes no change in the principal management of the dealer. Notwithstanding the terms of any franchise agreement, a manufacturer or distributor may not enforce any requirements, including facility requirements, that a new motor vehicle dealer establish or maintain exclusive facilities, personnel or display space, when the requirements are unreasonable considering current economic conditions and are not otherwise justified by reasonable business considerations.  The burden of proving that current economic conditions or reasonable business considerations justify exclusive facilities is on the manufacturer or distributor and must be proven by a preponderance of the evidence;

C&O asserts that "the exclusive facilities, personnel

and display space demand, and the termination threat made by GM, were both unreasonable requirements and prohibited practices." In support, C&O observes that GM permitted unidentified West Virginia dealers to share GM facilities with other manufacturers without requiring separation. GM responds contending that its requirements were reasonable given current economic conditions and business considerations and further insists that the reasonableness is demonstrated by C&O's assent to those terms in the letter agreement.

In light of the parties' positions and observing that, notwithstanding the terms of the Dealer Agreement, the burden of demonstrating that the exclusivity requirement was reasonable is on GM, the court concludes that the alleged violation of this statute presents a question of fact.

Also, under subsection (g), GM could not require C&O to "[c]hange the location of the new motor vehicle dealership or make any substantial alterations to the dealership premises, where to do so would be unreasonable."

GM has offered persuasive evidence of the reasonableness of its request that C&O separate the Nissan dealership, including the terms of both the letter agreement and Dealer Agreement, and

28

C&O's agreement with Nissan.  Nonetheless, it appears that the reasonableness of GM's requirement is a question that is similarly best resolved by a jury.

According to subsection (h) of the statute, a vehicle manufacturer may not require a dealer to

> Prospectively assent to a release, assignment, novation, waiver or estoppel which would relieve any person from liability imposed by this article or require any controversy between a new motor vehicle dealer and a manufacturer or distributor to be referred to a person other than the duly constituted courts of the state or the United States, if the referral would be binding upon the new motor vehicle dealer.

C&O asserts that GM violated this section by requiring (1) C&O release GM for the costs and expenses it would incur to separate its facilities; (2) C&O to "assent to an estoppel by demanding it agree to 'make' a series of bogus representations including without limitation commercially reasonable behavior, that it was acting of its free will, that it was not coerced by threats to terminate both its Oldsmobile and Chevrolet franchises;" and (3) requiring C&O to pay GM's attorneys' fees and costs in subsequent litigation.  GM responds observing that C&O voluntarily agreed to these terms insofar as they were contained in the letter agreement.

Again, the fact that Love found it appropriate to strike

29

certain terms of the letter agreement but signed the letter
agreement acknowledging that the agreement was not coerced
presents an insurmountable burden for C&O's claim that GM
attempted to extract an agreement from Love.  Indeed, Love elected
not to strike the provision of the letter agreement that
specifically provided that C&O was to bear the costs of separating
the Nissan dealership.  Moreover, C&O's claim that GM required
indemnification from C&O with respect to attorney's fees and costs
in subsequent litigation is somewhat puzzling inasmuch as Love
struck this provision from the letter agreement.  The court thus
concludes that C&O's claim under this statute fails as a matter of
law.

    4.   <u>W. Va. Code § 17A-6A-10(2)(a),(g),(q)</u>

    West Virginia Code Section 17A-6A-10(2)(a) provides in
pertinent part that

> (2) A manufacturer or distributor may not do any of the
> following:
>
> (a) Fail to deliver new motor vehicles or new motor
> vehicle parts or accessories within a reasonable time
> and in reasonable quantities relative to the new motor
> vehicle dealer's market area and facilities, unless the
> failure is caused by acts or occurrences beyond the
> control of the manufacturer or distributor, or unless
> the failure results from an order by the new motor
> vehicle dealer in excess of quantities reasonably and
> fairly allocated by the manufacturer or distributor.

C&O contends that GM failed to deliver new motor vehicles at

reasonable times and in reasonable quantities, while GM insists that it delivered new Oldsmobiles at reasonable times and in reasonable quantities.  GM again observes that C&O cannot demonstrate that GM did not honor an order for an Oldsmobile vehicle.  From the parties' positions it again appears questions of fact remain as to whether GM's conduct was reasonable.  See LaPosta Oldsmobile, Inc. v. General Motors Corp., 426 F. Supp.2d 346, 352 (N.D. W. Va. 2006)("whether or not GM's actions are reasonable under West Virginia Code § 17A-6A-10(2)(a) is a question of fact.")

    Under subsection (g) of this same statute a manufacturer may not "[d]eny a new motor vehicle dealer the right to associate with another new motor vehicle dealer for any lawful purpose."  C&O asserts that GM denied it the right to associate with Nissan; however, there are no facts to support this assertion.  The undisputed facts of this case indicate that C&O was permitted to associate with Nissan and in fact did so.  Accordingly, C&O's claim under this subsection fails.

    Subsection (q) provides that a manufacturer may not "[u]nreasonably restrict a dealer's ownership of a dealership through noncompetition covenants, site control, sublease, collateral pledge of lease, right of first refusal, option to purchase, or otherwise."  C&O asserts that GM unreasonably restricted its "ownership of the

31

Nissan dealership by site control or otherwise."  GM responds

asserting that C&O's ownership of the Nissan dealership was

unaffected by GM in any way.

          The undisputed facts of this case indicate that C&O agreed

to separate the Nissan dealership by way of an agreement with Nissan

executed approximately four months prior to the allegedly threatening

conduct of GM.  C&O then freely entered into an agreement with GM in

which it, among other things, agreed to bear the costs of this

separation.  The court finds that there is simply no evidence that GM

unreasonably restricted C&O's ownership of the Nissan dealership.

Thus, its claim under this subsection fails.

     5.   <u>W. Va. Code § 17A-6A-10(5)</u>

          West Virginia Code Section 17A-6A-10(5) provides in its

entirety that

> (5) Except when prevented by an act of God, labor
> strike, transportation disruption outside the control
> of the manufacturer or time of war, a manufacturer or
> distributor may not refuse or fail to deliver, in
> reasonable quantities and within a reasonable time, to
> a dealer having a franchise agreement for the retail
> sale of any motor vehicle sold or distributed by the
> manufacturer, any new motor vehicle or parts or
> accessories to new motor vehicles as are covered by the
> franchise if the vehicles, parts and accessories are
> publicly advertised as being available for delivery or
> are actually being delivered.  All models offered for
> sale by the manufacturer, without any enrollment,
> surcharge, unreasonable facility or building or any

other unreasonable type of upgrade requirement or
acquisition fee, shall be available to the franchised
dealer at no additional cost for that particular model
of vehicle.

C&O opaquely asserts that this section requires new vehicles "to be
made available without unreasonable facility, building or other
requirements being imposed." GM responds maintaining that it made
new Oldsmobile vehicles available to C&O during the term of the
Dealer Agreement and the subsection does not address facility,
building or other requirements. It is not entirely clear how this
subsection applies in this case. Although C&O relies on the
"unreasonable facility" language in the statute, there is no
allegation by C&O nor is there any evidence that GM imposed any
impermissible costs on C&O as prohibited under this subsection.
Accordingly, C&O's claim under West Virginia Code Section 17A-6A-
10(5) fails as a matter of law.

## C.   C&O's Claim for "Mitigation Costs"

The court next addresses C&O's claim for damages. C&O
has alleged that it is has incurred $2,473,456 in damages as a
result of GM's breach of the Dealer Agreement.[13]   GM responds

---

[13] C&O summarizes its claim for contractual damage
as follows:

| | |
|---|---|
| Cost of acquiring the Nissan franchise and a limited amount of furnishings, fixtures and tools from Raines imports | $1,013,920 |
| Costs related to the construction/renovation of dealership facilities | 526,641 |

contending that, even assuming for the purposes of this motion that C&O incurred $2,473,456 in damages, those damages are not recoverable as a matter of law.  According to GM, C&O actually bettered its condition by acquiring the Nissan dealership.  In support, GM cites Love's deposition in which he testified that Nissan's "blue sky" value is about two and half million dollars, approximately one and a half million dollars more than he paid for the Nissan dealership, and the entire value of the Love Nissan franchise is 5 to 8 million dollars.  (Love Depo. at 50-51, attached as Ex. D to Pl.'s Memo.)  GM accordingly asserts that inasmuch as the value of the Nissan dealership exceeds the amount C&O paid for it, C&O is not permitted to recover the cost of acquiring the Nissan dealership.

   With respect to the costs incurred to purchase and renovate a building to house the Nissan dealership, GM asserts that C&O expressly agreed to assume those costs under the letter agreement and is now precluded from recovering them as "damages." Furthermore, GM observes that Nissan, by way of a separate

---

| | |
|---|---|
| Fair market rental value of the facilities that temporarily accommodated the Nissan showroom during construction and renovation | 269,917 |
| Statutory Interest (at 10% per annum through July 2006) | 662,978 |
|    Total Damages | $ 2,473,456 |

agreement executed approximately four months prior to GM's proposed letter agreement was sent to Love, required C&O to separate the Nissan and Chevrolet facilities.

C&O responds explaining that its contractual damages claim is a result of its efforts to mitigate damages. More specifically, C&O insists that it "was attempting to fill the void created by GM's withdrawal of the Oldsmobile product line rather than just suffer the consequences." C&O further clarifies that it is asserting "no claims of lost profits or other consequential damages" and only seeks "its mitigation costs." According to C&O, it "paid to mitigate against the profits it would inevitably lose."

The court first observes that GM has represented and C&O does not dispute that this is the only case arising out of GM's termination of the Oldsmobile line in which a dealer has sought to recover the cost of acquiring a new dealership. Despite conceding that GM was not required to renew the Dealer Agreement with respect to the Oldsmobile line upon its expiration, C&O contends that GM was obligated to buy it a new dealership, build it a new facility in which to house the dealership, and compensate it for the fair market rental value of the facility used to temporarily house the Nissan dealership. Such a claim, as a matter of law, fails.

C&O has not identified a specific contractual provision

entitling it to such extraordinary damages.  Generally, a party injured by a breach of contract is entitled to his expectation interest, or "his interest in having the benefit of the bargain by being put in as good a position as he would have been in had the contract been performed."  Restatement of the Law 2d, Contracts (1981) 102-03, Section 344.   Had GM continued to deliver Oldsmobiles under the Dealer Agreement, C&O would have received the profits from the sale of those vehicles.  The record before the court indicates that from 1999 to 2002 C&O sold, on average, approximately 222 Oldsmobile vehicles per year at an average annual gross profit of $1,039 per vehicle.  Accordingly, its average gross profit per year over this period was $230,658.  Assuming C&O would have continued to sell the average number of vehicles for the 14 month period in which Oldsmobiles were not provided by GM (on or about September 1, 2004 to October 31, 2005) its gross profit would have been approximately $269,101.  While the court is not stating with certainty that this is the proper measure of damages in this case, C&O's damages figure, which it labels a "mitigation cost," is a significant multiple of the damages C&O actually incurred as a result of GM's failure to continue to deliver new Oldsmobiles through the expiration of the Dealer Agreement.

    C&O simply cannot escape the undisputed fact that had GM continued to deliver Oldsmobile vehicles under the Dealer Agreement

through its expiration on October 31, 2005, C&O would have had to incur both the cost of acquiring the Nissan dealership and the costs associated with the separation of the new dealership in accordance with C&O's agreement with Nissan.  Indeed, these costs were incurred prior to GM's alleged breach of the Dealer Agreement. Thus, C&O's "mitigation costs" were not caused by GM's alleged breach of the Dealer Agreement.  C&O is only entitled to be in the same position it would have occupied had GM properly performed under the Dealer Agreement and it cannot seek to recover a windfall under the guise of "mitigation costs."[14]

C&O claims that absent GM's wrongful threat to terminate the Chevrolet dealership, its mitigation claim would be limited to the approximately $1,000,000 C&O spent to acquire the Nissan dealership.  This claim simply does not withstand scrutiny.  Four months prior to the mailing of the allegedly threatening letter agreement and well prior to the alleged breach of the contract, C&O had expressly agreed with Nissan to provide separate facilities for the Nissan dealership.

It is also worthy of mention that GM has suggested that

---

[14] Had C&O's investment in the Nissan dealership lost value, C&O may have incurred a compensable loss, assuming that it could demonstrate that the acquisition of the Nissan dealership was the result of GM's breach of the Dealer Agreement.  The undisputed facts, however, indicate that C&O's investment in the Nissan dealership has been quite profitable.

because C&O sold more Nissan vehicles than Oldsmobile vehicles during the 2004 and 2005 period C&O may not be entitled to any damages.  Should GM make such an assertion it seems reasonable to permit C&O to recover a portion of the cost of purchasing and separating the Nissan dealership.[15]  The court further observes that, as a matter of law, C&O may not recover both its lost profits and a portion of the costs associated with its acquisition of the Nissan dealership inasmuch as this would amount to an impermissible double recovery.

IV.

In view of the foregoing it is ORDERED, that

(1) GM's motion to dismiss be, and it hereby is, denied;

(2) GM's motion for summary judgment be, and it hereby is, denied to the extent it seeks dismissal of C&O's breach of contract claim under Article 6.4.1 and C&O's statutory claims under W. Va. Code §§ 17-6A-10(1)(f); 17-6A-10(1)(g); and 17A-6A-10(2)(a);

(3) the motion for summary judgment be, and it hereby is, otherwise granted; and

---

[15]It would seem that an alternative damages figure could be calculated using the amortized cost of acquiring and separating the Nissan dealership.  This figure would undoubtedly be significantly less than that proposed by C&O.

(4) C&O's claim for an anticipatory breach of the Dealer Agreement be, and it hereby, is dismissed as moot.

The Clerk is directed to forward copies of this order to all counsel of record.

DATED: December 1, 2006

_____
John T. Copenhaver, Jr.
United States District Judge