```
            UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF WEST VIRGINIA
                   AT CHARLESTON
```

C & O MOTORS INC.,
a West Virginia Corporation,

    Plaintiff

v.                                    CIVIL ACTION NO. 2:05-0835

GENERAL MOTORS CORPORATION,
a Delaware Corporation,

    Defendant

## MEMORANDUM OPINION AND ORDER

Pending before the court is defendant's motion, filed March 5, 2007, seeking to strike plaintiff's claim for damages.

### I.

**A.  C&O's Claims**

Two of C&O's original claims currently remain pending. Both claims relate to GM's alleged failure to supply C&O with adequate quantities of Oldsmobile vehicles.  With respect to damages, C&O seeks to recover its lost profits from June of 2002 through October of 2005 in the following departments: new vehicle sales, used vehicle sales, service, and parts.

1

B.  **Expert Testimony of Gene Walker**

In support of its alleged lost profits damages, C&O relies on the expert testimony of Gene Walker, its general manager.  Additionally, David W. Epperly, a certified public accountant, assisted Walker with his lost profits analysis.

As background, Walker is a high school graduate who joined C&O as a car salesman in 1970.  (Walker Dep. at 7.)  In April of 1972, Walker became C&O's new car manager, and in 1975 he became general manager of C&O.  (Id.)  He has held that position to date.  (Id.)

Walker's lost profits analysis is summarized as follows:

|          | 2002 Loss | 2003 Loss | 2004 Loss | 2005 Loss |
|----------|-----------|-----------|-----------|-----------|
| New Cars | $ 138,310 | $ 296,874 | $ 279,937 | $ 327,343 |
| Used Cars | 69,840   | 149,784   | 180,156   | 179,239   |
| Parts    | 31,649    | 52,814    | 61,594    | 65,337    |
| Service  | 20,398    | 31,099    | 42,785    | 45,808    |
| Total    | $ 260,197 | $ 530,570 | $ 564,472 | $ 617,726 |

(Walker/Epperly Spreadsheets at 10, attached as Ex. C to Def.'s Mot.)  The annual loss figures are then summed to arrive at C&O's proposed total lost profits damages figure: $1,972,985.  (Id.)

2

C.  **Walker's Methodology**

   1.  **Projecting New Oldsmobile Sales**

GM's motion focuses on Walker's projection of new Oldsmobile vehicle sales. The following chart indicates C&O's new Oldsmobile vehicle sales by year

| Year | No. of Vehicles |
|------|-----------------|
| 1997 | 175 |
| 1998 | 211 |
| 1999 | 207 |
| 2000 | 163 |
| 2001 | 325 |
| 2002 | 192 |
| 2003 | 110 |
| 2004 | 67 |
| 2005 | 7 |

(Nelawake Rep. at 4; Walker/Epperly Spreadsheet at 1.)

Walker opines that, but for GM's phase-out of the Oldsmobile line in June of 2002, C&O would have sold 307 Oldsmobiles in 2002, 303 Oldsmobiles in 2003, 305 Oldsmobiles in 2004, and 270 Oldsmobiles through October of 2005. (Epperly Spreadsheets, attached as Ex. C to Def.'s Mot.)

In arriving at these figures, Walker used GM's new Oldsmobile sales in 2001, 325 vehicles, as a "baseline year." (Walker Depo. at 21-22). To determine if there would be variance in the sales of Oldsmobiles in years subsequent to 2001, Walker

3

referenced the number of Chevrolet vehicles C&O sold in that year.

As more fully set forth at Walker's deposition,

> Q. [T]o determine whether there was variance off of 2001, you looked at how the Chevy brand performed; is that correct?
>
> A. That's correct.
>
> Q. So for example, in 2002, there were 1829 Chevys sold; is that correct?
>
> A. That's correct.
>
> Q. Now, the difference between 1829 and 1935 [the number of Chevrolet vehicles sold in 2001], you calculated a certain percentage; is that correct?
>
> A. I didn't. David [Epperly] did, but I told him to do that.
>
> Q. Okay. And that percentage variance was then applied to the Oldsmobile sales for 2001 –
>
> A. Right.
>
> Q. – to come up with what the projected sales for 2002 Oldsmobile sales would be; is that correct?
>
> A. That's correct.
>
> Q. Okay. Why did you choose to key Oldsmobile future sales to Chevy sales?
>
> A. They were General Motors products, so that's why I keyed them to that.

(Walker 2/2/2007 Depo. at 22-23, .)  Walker further explained the

rationale for his approach to projecting Oldsmobile sales

> When I was looking at how many Oldsmobiles C&O Motors would have been able to sell over this time period, I wanted to adjust Oldsmobile sales to follow Chevrolet

4

> sales as a way to adjust for things that were going on in the economy generally. I have been selling cars and truck [sic] for 37 years, and it is my opinion that if GM had made the number of cars available to us that we had in 2001 in the following years we would have sold them and made a profit on them. Even so, I thought that it was reasonable to adjust the 2001 sales down to follow the same pattern that our Chevy sales had taken.

(Walker Supp. Rep. at 2.) The projected lost new Oldsmobile vehicle sales form the basis of Walker's entire lost profits analysis.

    2.    <u>Used Cars</u>

As for C&O's claim for lost profits on used cars, Walker states

> We take in trades when we sell new cars, and we also buy and sell used cars at auctions. We have one used car lot for all of our dealerships. I looked at our historical information again taken from the GM operating reports and calculated the ratio of trade ins for new cars sold for each year . . .
> I used the ratio which was calculated for each year to estimate the used car volume in relation to new car sales and to allocate used car profits to the Oldsmobile dealership on a volume basis.

(<u>Id.</u> at 2-3.)

    3.    <u>Service and Parts</u>

With respect to C&O's claim for lost profits related to Oldsmobile parts and service, Walker explains

5

> We had one service facility for both Chevrolet and Oldsmobile.  The same was true for parts.  I get monthly reports from the office which allow me to look specifically at dealerships on a monthly basis. (The GM operating reports give combined numbers.)  . . . I allocated the GM parts and service totals based on new Oldsmobile units sold as a percentage of GM units sold each year.

Id. at 3.[1]

D.  Epperly's Role

Walker described Epperly's role as limited to (1) assuring that Walker had properly accounted for variable costs and taxes; (2) making the variable cost calculations "regarding the variable cost items which could not just be pulled from the GM operating statements;" and (3) calculations respecting the allocation of "prep. income and other income and deductions to Oldsmobile."  (Walker 2/22/07 Rep. at 3-4.)  Additionally, Walker states that

> [S]ince I do not use computers myself, I asked him [Epperly] to take my approach to calculating actual Oldsmobile income over the five years of the last Dealer Agreement, to follow that approach and my opinion as to what C&O would have been able to accomplish if GM's supply of vehicles over the five

---

[1] GM's expert witness on C&O's damages contends that "[s]ufficient information has not been provided by C&O to allow a determination of the service and parts profits relating to new Oldsmobiles sold by C&O . . . However, I have reduced Mr. Walker's per unit amount by only 25% on a reasonableness basis."  (Nelawake Rep. at 6, attached as Ex. D to Def.'s Mot.)

6

> year term of the contract was comparable to what GM
> was supplying in 2001, and to some extent the first
> half of 2002, and then prepare a spreadsheet which
> could be used as an exhibit at trial to show how I
> arrived at C&O's lost profits claim.

(<u>Id.</u> at 4).

Although acknowledging that he has testified as an expert witness in other cases in which he conducted a lost profits analysis, Epperly does not intend to offer an opinion as to lost profits here. (Epperly Depo. at 7-8, attached as Ex. A to Def.'s Memo.) Epperly stated at deposition

> I'm not offering any opinions as to the lost profits.
> I was retained in this case strictly to develop the
> spreadsheet model based upon Mr. Walker's concept or
> vision of the losses . . . Basically I took his
> concept of the losses and was asked to put those in a
> spreadsheet model that would produce a set of
> exhibits that he [Walker] could present or testify
> from in offering his opinions as to the lost profits.
> [] In addition to that, or secondary to that, I was
> asked to perform a couple calculations with regards
> to computing certain cost ratios that are applied for
> some expense offsets that are included in the
> analysis that Mr. Walker wanted to make sure were
> included.

(<u>Id.</u>)

E. <u>GM's Motion</u>

GM asserts that (1) Walker's expert report does not comply with Federal Rule of Civil Procedure 26(a)(2)(B); (2) Walker is not qualified to testify as an expert witness with

7

respect to C&O's lost profits; and (3) even if Walker could qualify as an expert witness his opinion is not the product of reliable principles and methodology and should be excluded under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).  GM requests that the court strike C&O's claim for damages and enter judgment in favor of GM.

## II.

This case concerns lost profits and a brief review of the law in West Virginia on this issue is helpful.  Under West Virginia law, a business may recover lost profits only if it establishes them with reasonable certainty.  <u>Cell Inc. v. Ranson Investors</u>, 427 S.E.2d 447, 450 (W. Va. 1992).  The West Virginia Supreme Court has cited with approval the Restatement Second of Contracts § 352 cmt. b (1981), which states in pertinent part

> If the breach prevents the injured party from carrying on a well-established business, the resulting loss of profits can often be proved with sufficient certainty.  Evidence of past performance will form the basis for a reasonable prediction as to the future.  However, if the business is a new one or if it is a speculative one that is subject to great fluctuations in volume, costs or prices, proof will be more difficult.  Nevertheless, damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like.

Id. at 449-50.

III.

GM insists that Walker is not qualified to give expert testimony inasmuch as he lacks the knowledge, skill, experience, training, and education necessary to serve as an expert in the field of projecting future lost profits.  GM observes that Walker (1) does not have any advanced education or training relevant to the creation of economic models, market analysis, or business projections; (2) has never written any articles regarding the calculation of future lost profits; and (3) has no experience projecting future lost profits.  GM further contends that even if Walker is treated as qualified to render an expert opinion, his testimony with respect to future lost profits must meet the test of Daubert.  GM specifically challenges Walker's methodology in calculating C&O's future lost profits based on a single abnormally high year of Oldsmobile sales by C&O.

C&O responds contending that Walker was under no obligation to produce an expert report inasmuch as he is not a retained expert.  C&O further asserts that Walker is qualified as an expert witness, but observes that most of Walker's testimony is factual testimony regarding C&O's historical performance which

9

is not subject to the rigors of Rule 702.  C&O concedes, as it must, that Walker is offering an opinion as to the number of Oldsmobile vehicles that C&O would have sold if GM had made them available for the duration of the contractual period.  According to C&O, this is an opinion that Walker is qualified to make as an experienced car salesman and the manager of a highly successful car dealership.

C&O then proceeds to observe that lay witnesses may testify in regard to lost profits under Federal Rule of Evidence 701.  More specifically, C&O notes that a lay witness with special knowledge of a business may testify as to the facts of the business that underlie profit expectations.  Oddly, C&O does not address GM's pervasive attack on the methodology used by Walker to arrive at his lost profit calculations.[2]

A.  <u>Walker's Expert Report</u>

Addressing C&O's initial contention that Walker cannot be compelled to produce a report because he is not a retained

---

[2] C&O further insists that the difficulty in calculating lost profits and C&O's high lost profits damages serves to illustrate that the parties should be litigating C&O's original mitigation claim.  After extensive consideration, the court twice rejected C&O's purported mitigation claim.  It need not discuss it further.

expert witness, the court observes that C&O has proffered Walker as an expert witness qualified to opine as to C&O's lost profits. Moreover, while C&O disputes the authority of the court to do so, the court appropriately directed the plaintiff at a pretrial conference to have Walker produce an expert report on lost profits, thereby permitting the court in advance of trial to assess the report in light of <u>Daubert</u>. The court did so after ruling against the plaintiff on its mitigation of damages claim to the end that C&O might instead proceed on the basis of a lost profits claim.

That Walker is not a retained expert, but a C&O employee, does not somehow mean that the court may not require him to produce an expert report under the general authority of Fed. R. Civ. P. 26(a)(2) and (3). Indeed, one circuit court of appeals has explicitly rejected C&O's suggestion that a "blanket exception" to the expert report requirement exists when an expert witness is also a party's employee. <u>Prieto v. Malgo</u>, 361 F.3d 1313, 1318 (11th Cir. 2004). As the court in <u>Prieto</u> explained, such an exception would "'create a category of expert trial witness for whom no written disclosure is required' and should not be permitted." <u>Id.</u> (internal citation omitted).

11

Here, Walker is testifying in the capacity of a traditional expert witness, he is providing a technical evaluation of evidence (C&O's historical sales and financial data) to arrive at an opinion (C&O's lost profits). An expert report which sets forth the methodology employed in this undertaking is crucial where, as GM has done here, the expert's principles and methodology are challenged under <u>Daubert</u>. Indeed, it would not be feasible for the court to conduct an orderly <u>Daubert</u> analysis in advance of trial in the absence of an expert report from Walker. In view of the contents of the report, as the analysis that follows demonstrates, it was particularly propitious that C&O furnish an expert report by Walker for scrutiny prior to trial.

B.  <u>Walker's Qualifications and Methodology</u>

As for Walker's qualifications, the court acknowledges that Walker may be qualified as an expert witness by way of his practical experience. An advanced degree or published articles subject to peer review are not prerequisites for his proposed expert testimony. The fact that Walker may be qualified as a non-retained expert witness does not, however, mean that Walker's analysis escapes the rigors of <u>Daubert</u>.

Respecting the Daubert standard, Federal Rule of Evidence 702 provides that

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The rule "requires that the [expert] testimony must be the product of reliable principles and methods that are reliably applied to the facts of the case." Fed. R. Evid. 702 advisory committee note.

Our court of appeals has observed that the first prong of a Rule 702 inquiry is whether the reasoning or methodology underlying the expert's proffered opinion is reliable -- that is, whether it is supported by adequate validation to render it trustworthy. U.S. v. Moreland, 437 F.3d 424, 431 (4th Cir. 2006) (quoting Daubert, 509 U.S. at 590). The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence. Daubert, 509 U.S. at 592.

Applying <u>Daubert</u>, Walker's proposed testimony does not meet the standard of an expert with respect to reliable principles and methodology.  In his analysis, Walker uses only the year 2001 as his "baseline year" for projecting new Oldsmobile sales, an approach aptly described by GM as "cherry-picking."  Walker ignores all Oldsmobile vehicle sales data for the years prior to 2001.  He relies solely on the single year of 2001, a year in which C&O's sales of Oldsmobiles soared dramatically as a result of GM's exceptionally high rebate incentives that followed its public announcement on December 12, 2000, that the Oldsmobile line would be phased out.  As Walker explained upon inquiry at his deposition

> Q.  Do you know why your sales volume went up so dramatically in 2001 compared to your previous 3 or 4 years?
>
> A.  They [GM] changed their rebates totally.  I mean, you know, they wanted to get out of the business.  So they cut the price of the car where all of a sudden Oldsmobile was a bargain.

(Walker August 23, 2006, Depo. at 45-46.)  Additional evidence of record supports the conclusion that 2001 was an exceptional year for C&O with respect to its new Oldsmobile vehicle sales, especially when compared, as C&O does, to its Chevrolet new

14

vehicle sales.[3]  While new Chevrolet vehicle sales in 2001 were virtually the same as 2000, new Oldsmobile sales essentially doubled for that same period.  Walker's analysis, however, does not take into consideration the rebate program that he concedes dramatically increased Oldsmobile sales volume in 2001, nor does his analysis take into consideration GM returning to more normal rebate levels for Oldsmobiles in the years after 2001.[4]

Instead, Walker relies solely on the unprecedented Oldsmobile vehicle sale levels in 2001 to project future Oldsmobile vehicle sales.  At his deposition, Walker acknowledged that he did not rely on any treatises, expert reports, or books in formulating his lost profits analysis.  (Walker February 2, 2007, Depo. at 33-34.)  Also of relevance, Epperly was unable to

---

[3] The following chart shows C&O's annual new Oldsmobile sales as a percentage of C&O's annual new Chevrolet sales.

|      | Oldsmobile | Chevrolet |
|------|------------|-----------|
| 1997 | 175        | 2,322     |
| 1998 | 211        | 2,127     |
| 1999 | 207        | 2,036     |
| 2000 | 163        | 1,931     |
| 2001 | 325        | 1,935     |

[4] GM's motion does not cite any evidence of record for its representation that the rebate levels for Oldsmobiles returned to more normal levels in the years following 2001.  C&O, however, has not refuted this representation in its response to GM's motion.

identify any treatises that suggest that it is appropriate to look at a single year in isolation when projecting future lost profits. (Epperly Depo. at 24.) Walker has provided no authority in support of his approach which, on its face, defies common sense, and it is quite plain that Walker's method for projecting new vehicle sales fails to comport with Daubert.

The remainder of Walker's lost profits analysis is similarly unsalvageable because it is grounded on the distorted year of 2001. In addition to the fact that the lost profits from projected new vehicle sales represent over half of C&O's alleged lost profits claims, the projected lost vehicle sales are relied upon in Walker's calculation of lost profits related to used car sales, service work, and parts sales. Walker's unreliable methodology thus infects all the components of his lost profits analysis, rendering the entirety of his opinion inadmissible under Daubert.

In view of the foregoing, the court concludes that Walker's approach to calculating C&O's lost profits is simply not the result of reliable principles and methods and thus must be excluded under Daubert.

16

Having found that Walker's analysis does not survive examination under Daubert, C&O is left without an expert witness in support of its claim for lost profit damages. Nevertheless, it is apparent from the facts of this case and the court's numerous orders that C&O is entitled to recover some measure of damages. The court is especially reluctant to enter judgment in favor of GM in light of the fact that GM's own expert values, perhaps conservatively, C&O's lost profits claim at approximately $270,000. Moreover, the court has previously ruled that treble damages in an amount up to three times C&O's compensatory damages may be awarded by a jury in conjunction with C&O's remaining statutory claim. Equity thus strongly militates in favor of continuing the July 31, 2007, trial date and affording C&O an opportunity to cure its deficient lost profits claim.

The court remains mindful of the numerous inconveniences that have befallen GM as a result of C&O's dilatory conduct. In its order addressing, among other things, C&O's motion to amend the pretrial order and C&O's related request for additional time for discovery, the court observed that C&O failed to act in a timely fashion in seeking its proposed amendment and this failure necessitated a delay in this action. The court then reserved the right to hear GM at a


subsequent time on its request for fees and costs incurred as a result of the continuance of the trial date.

Here, in response to the court's observation that expert testimony appeared necessary to properly demonstrate its claim for lost profits, C&O proffered expert testimony that, on its face, plainly fails to comport with Daubert. Although GM has not sought fees and costs incurred with the forthcoming continuance, the court again reserves the right to hear GM at a subsequent time regarding its fees and costs, including those associated with expert discovery, incurred as a result of another continuance of the trial date.

IV.

In view of the foregoing, it is ORDERED that:

(1) GM's motion be, and it hereby is, granted to the extent it seeks to exclude evidence of Walker's lost profits opinion in its current form, and it is otherwise denied;

(2) the trial of this action be, and it hereby is, continued to August 20, 2007;

(3) Walker is directed to produce an amended expert

report which contains opinions that comport with the requirements of <u>Daubert</u> on or before July 31, 2007; and

(4) the parties may conduct expert discovery through August 17, 2007.

The Clerk is directed to forward copies of this order to all counsel of record.

DATED: July 25, 2007

_____
John T. Copenhaver, Jr.
United States District Judge